# EXHIBIT P

Dennis Lormel
12/16/2014

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5    LIFE FOR RELIEF & DEVELOPMENT,

6    a Foreign Not-For-Profit

7    Organization,

8                Plaintiff,

9       vs.                        Case No. 2:12-13550-CV

10                                 Hon. Denise Page Hood

11   BANK OF AMERICA, N.A.,

12   a national banking association,

13               Defendant.

14   _____/

15   PAGE 1 TO 169

16

17               The Deposition of DENNIS LORMEL

18               Taken at 1901 St. Antoine Street, 6th Floor

19               Detroit, Michigan

20               Commencing at 9:31 a.m.

21               Tuesday, December 16, 2014

22               Before Mary Oppenheim, CSR-5186

23

24

25

Dennis Lormel
12/16/2014

Page 2

```
 1   APPEARANCES:
 2   MR. SHEREEF AKEEL (P54345)
 3   Akeel & Valentine, PLC
 4   888 West Big Beaver, Suite 910
 5   Troy, Michigan 48084
 6   248-269-9595
 7   shereef@akeelvalentine.com
 8       Appearing on behalf of the Plaintiff.
 9
10   MR. CARLO L. RODES
11   McGUIREWOODS, LLP
12   Fifth Third Center
13   201 North Tyron Street, Suite 3000
14   Charlotte, North Carolina 28202
15   704-343-2300
16   crodes@mcguirewoods.com
17       Appearing on behalf of the Defendant.
18
19   ALSO PRESENT:
20   Abdalah Boumedine
21   Mohammed Alomari
22   Larissa Bergin
23   Michael Kaszubski
24
25
```

Page 4

EXHIBITS CONTINUED

```
 2   Exhibit                                    Page
 3   DEPOSITION EXHIBIT NO. 7            117
 4   Life's Corporate Compliance Plan
 5   DEPOSITION EXHIBIT NO. 8            117
 6   Life's Find Transactions Report for 3/1/2011
 7   to 6/30/12
 8   DEPOSITION EXHIBIT NO. 9            118
 9   DML Associates 12/13/14 report
10   DEPOSITION EXHIBIT NO. 10           120
11   ReGroup Advisors' 12/1/12 letter to Life for Relief
12   DEPOSITION EXHIBIT NO. 11           120
13   ReGroup Advisors' 4/28/14 letter to Life for Relief
14
15       (Exhibits attached.)
```

Page 3

TABLE OF CONTENTS

```
 2   Witness                                    Page
 3   DENNIS LORMEL
 4
 5   EXAMINATION BY MR. AKEEL              6
 6   EXAMINATION BY MR. RODES           134
 7   RE-EXAMINATION BY MR. AKEEL        162
 8   RE-EXAMINATION BY MR. RODES        166
 9
10
11       EXHIBITS
12   Exhibit                                    Page
     DEPOSITION EXHIBIT NO. 1              8
13
     12/13/2014 DML Associates report
14
     DEPOSITION EXHIBIT NO. 2             25
15
     About the Investigative Project on Terrorism article
16
     DEPOSITION EXHIBIT NO. 3             31
17
     Articles from MilitantIslamMonitor.org
18
     DEPOSITION EXHIBIT NO. 4             76
19
     Documents from Bank of America
20
     DEPOSITION EXHIBIT NO. 5             82
21
     Bank of America Out-of-State Counterdeposits
22
     DEPOSITION EXHIBIT NO. 6             87
23
     Life For Relief Report for the Emergency Relief
24
     for Syrian Refugees in Jordan
25
```

Page 5

```
 1   Detroit, Michigan
 2   Tuesday, December 16, 2014
 3   9:31 a.m.
 4           D E N N I S  L O R M E L,
 5   was thereupon called as a witness herein, and after
 6   having been first duly sworn to tell the truth, the
 7   whole truth and nothing but the truth, was examined and
 8   testified as follows:
 9       MR. AKEEL:  Good morning.  My name is Shereef
10   Akeel and I represent the Plaintiff, Life For Relief &
11   Development, in a case currently pending in the United
12   States District Court before the Honorable Denise Page
13   Hood, versus Bank of America.  This morning we're here
14   to take the deposition of Mr. Dennis Lormel, pursuant to
15   proper Notice and the applicable Federal Court Rules.
16   Good morning, sir.
17       THE WITNESS:  Good morning.
18       MR. AKEEL:  I am pronouncing your name
19   properly?
20       THE WITNESS:  Close enough.
21       MR. AKEEL:  How do you pronounce it?
22       THE WITNESS:  Lormel.
23       MR. AKEEL:  Mr. Lormel, I'm sure you have
24   taken depositions before, or have you?
25       THE WITNESS:  Yes.
```

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 6

1    MR. AKEEL:  You know the drill.  I'm going to
2    ask you a series of questions.  If you can, answer them
3    to the best of your ability.  If there's a question you
4    don't understand, please state so and I'll gladly
5    rephrase it for you.  Please provide a verbal response
6    to each question so the court reporter can exactly
7    write -- so she can accurately write exactly what you
8    intended to state.
9    THE WITNESS:  Yes.
10    MR. AKEEL:  Please let me finish each
11    question before you proceed to answer for the sake
12    clarity, so when we look at the transcript we will know
13    exactly what you're responding to.  There may be times
14    during the deposition where you need to take a break.
15    That's fine.  The only thing I would ask is if there's a
16    pending question, we can take the answer and then we can
17    proceed to adjourn.  There may be times, as you know
18    from yesterday during the deposition, where the attorney
19    that's sitting next to you may place an objection on the
20    record.  Unless for some reason he states for you not to
21    answer, please go ahead and answer.  So don't get
22    startled, "What do I do?"
23    EXAMINATION BY MR. AKEEL:
24    Q.  Now, you indicated that you've taken depositions before.
25    Approximately how many?

Page 7

1    A.  I've taken three depositions since I've been a
2    consultant.  Back in my law enforcement days I've done a
3    number of depositions and affidavits.  I couldn't tell
4    you at this time how many, but since being a consultant
5    this will be my fourth.
6    Q.  As I understand it, you've kind of broke it out where in
7    the law enforcement days you had a certain set of
8    depositions and in your new civil life you've had three
9    depositions?
10    A.  Right.
11    Q.  With respect to the three depositions -- I don't want to
12    know anything if it's a personal nature, but with
13    respect to your consultation -- in the capacity of being
14    a consultant, what was the subject matter of the
15    depositions, just briefly, the cases?
16    A.  They were all focused on money-laundering or
17    anti-money-laundering and they involved financial
18    institutions, or non-bank financial institution in one
19    case.
20    Q.  Where were the cases?
21    A.  One was in California, in Irvine, and actually in that
22    case I actually testified following the deposition.
23    That was last December.
24    Q.  Do you remember the name of the case?
25    A.  In my statement is the court number -- case number.

Page 8

1    Q.  Okay.
2    A.  Yeah, it was --
3    Q.  You mean it's in your resume?
4    A.  No, no, it's in the written statement.
5    MR. AKEEL:  I'll mark this since we will be
6    referring to it.
7    (Whereupon Deposition Exhibit No. 1
8    was marked for identification.)
9    Q.  (By Mr. Akeel):  Mr. Lormel, I've given you what's been
10    marked as Exhibit 1.  You said there's a reference in
11    there regarding the case you testified to.  If you
12    could, just direct us to which page.
13    A.  Prior testimony, page three, the last paragraph under
14    Previous Testimony.  The case number was EDCV 12-016404.
15    Q.  In any of the -- well, you said there were three, so
16    that's one of them.  What were the other two?
17    A.  There was a case in Birmingham in Federal Court down
18    there and that involved a bank and industry standards
19    for money-laundering best practices.
20    Q.  Do you remember the name of the case?
21    A.  It involved Regions Bank.  I don't recall who the
22    plaintiff was.
23    Q.  Regions?
24    A.  Regions.
25    Q.  What year was that, about, approximately?

Page 9

1    A.  That started I believe in 2012.
2    Q.  What's the outcome of the case?
3    A.  They settled.
4    Q.  The plaintiff settled?
5    A.  Yes.
6    Q.  Do you know what the settlement was?
7    A.  No, I have no idea.
8    Q.  What's the third one?
9    A.  Let's see.  What was that one?  Give me a second here.
10    Okay.  It involved another Bank of America case.
11    Q.  Were you the expert for Bank of America?
12    A.  Yes.
13    Q.  And what year was that?
14    A.  That was 2012 and I don't know what the resolution is.
15    It may still be pending.
16    Q.  What's the nature of the case?  What's the allegation?
17    A.  They were dealing with a money service -- a company that
18    was technically a money services business and that
19    company and one of their clients sued Bank of America
20    after they had settled -- after that company settled
21    with the government.  They were not registered as a
22    money services business as they should have been and
23    basically they blamed Bank of America for not informing
24    them that they should have been registered.
25    Q.  What year was that case?

3 (Pages 6 to 9)

Dennis Lormel
12/16/2014

Page 10

1   A. It started in 2012.
2   Q. Is it still pending?
3   A. I'm not sure. I believe so.
4   Q. Do you know which state?
5   A. It would have been Charlotte, North Carolina.
6   Q. And who is the name of the plaintiff?
7   A. The name of the company -- I just had it on the top of
8      my head, sorry. Metropolitan is the name of the
9      company.
10  Q. And who is the name -- what's the name of the owner of
11     the company?
12  A. I don't recall.
13  Q. Is he of Arab ethnicity?
14  A. No, I don't believe so.
15  Q. Is he Caucasian?
16  A. I don't know, but I don't believe so.
17  Q. What do you think he is?
18  A. I thought he was Latin American.
19  Q. And what's the allegation that's being made by the
20     individual plaintiff in that case in Charlotte, North
21     Carolina?
22  A. Again, the basic allegation was that that was a money
23     services business that should have been licensed and
24     registered with FinCEN and the state, and they weren't.
25     And they and a client -- I think it's the client in

Page 11

1      particular sued Bank of America for not having informed
2      them that they had the responsibility to be licensed and
3      registered.
4   Q. Did he make any claims of discrimination?
5   A. No.
6   Q. Do you know who the attorney is on the plaintiff's side?
7   A. As I'm sitting here, no.
8   Q. Have you given testimony in that case?
9   A. No.
10  Q. So this case is in 2012. You don't know the name of the
11     plaintiff?
12  A. Not off the top of my head, no.
13  Q. You don't know the name of the company?
14  A. Metropolitan. I already told you that.
15  Q. You said that. And they've settled with Metropolitan,
16     you said?
17  A. The law firm never told me, so I haven't followed up.
18  Q. Besides these three, any other depositions that you've
19     been involved in as a consultant?
20  A. Not a deposition, but a statement that got filed in
21     court.
22  Q. And what case is that?
23  A. I don't recall the name off the top of my head. It was
24     about 2010.
25  Q. And what's the nature of the case?

Page 12

1   A. The side that I was testifying for, that I had written
2      the report for, was a business that did third-party
3      processing and they were having problems with state
4      regulators and so I had written a report for the state
5      regulators -- I mean, to provide to the state
6      regulators.
7   Q. So you wrote it for the business?
8   A. Yes.
9   Q. Do you know what state that is?
10  A. I did the case in Washington, D.C. I believe that their
11     client was in the state of Washington. I'm not
12     positive. I believe the case was being heard in
13     District Court in the District of Columbia.
14  Q. Do you remember the name of the case?
15  A. Not off the top of my head as I'm sitting here.
16  Q. Have you ever been asked to provide any expert opinion
17     regarding nonprofit organizations as a consultant?
18  A. I've had another case where I've been retained that
19     involved a non-profit -- or a group of non-profits and
20     some Islamic principals.
21  Q. What case? Please share that with us.
22  A. It's referred to as the Herndon Charities in Herndon,
23     Virginia.
24  Q. When were you retained?
25  A. That would have been in 2004.

Page 13

1   Q. And what happened there?
2   A. It was a complex situation. You had a criminal case and
3      you had a civil case and the two principals -- I believe
4      they had been indicted in the Eastern District of
5      Virginia and there were related charities under the
6      umbrella of the SAAR Foundation, S-A-A-R.
7   Q. What does that stand for?
8   A. I'm not sure what the acronym stands for.
9   Q. Who were you retained by?
10  A. By the two principals and SAAR Foundation.
11  Q. And who were they?
12  A. It was Dr. Yaqub Mirza, and the second principal I don't
13     recall off the top of my head. It started with a B.
14     Dr. Berzingi.
15  Q. What was your role in that? What were you asked to do?
16  A. Initially it dealt with the ongoing criminal
17     investigation and it was to act as expert consultant
18     working with the defense lawyers for the potential
19     prosecution, in dealing with the prosecution.
20  Q. This was back in 2005?
21  A. It went on for quite a while.
22  Q. At that time what was your normal employment?
23  A. I was a consultant.
24  Q. You were a consultant back in 2005?
25  A. Yes.

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 14

1   Q. Were you ever retained by anyone to render an expert
2      opinion regarding the operation of a charity or a
3      non-profit organization?
4   A. The operation itself, no.
5   Q. Are you aware of the term "charity navigator"?  Do you
6      know what that means?
7   A. No.
8   Q. Are you aware of an entity by the name of Interaction?
9   A. No.
10   Q. Are you aware of a rating organization out there that
11      rates charities?
12   A. I know that there are some. I certainly know -- I was
13      going to -- for instance, United Kingdom, I'm familiar
14      with what goes on there. In the U.S., I don't know what
15      agency would do that. I know that the Treasury
16      Department and IRS to a degree certainly have interest
17      in charities; IRS with the 990s, Treasury, especially
18      after 9/11, their office of Terrorist Finance and
19      Financial Crimes.
20   Q. Have you engaged in any efforts to do research for Life
21      For Relief & Development?
22   A. Yes, I looked at their website.
23   Q. Besides their website, did you do anything else?
24   A. No.
25   Q. When were you retained in this case?

Page 15

1   A. I was first contacted in October. I think it was
2      October 8.
3   Q. And who were you contacted by?
4   A. Mr. Rodes.
5   Q. Before being contacted by Mr. Rodes, did you ever know
6      of him before that?
7   A. No.
8   Q. Were you ever retained by McGuireWoods before that?
9   A. Yes.
10   Q. How many times?
11   A. Once.
12   Q. And that's the other Bank of America case?
13   A. Yeah, unrelated to this. In fact, it was McGuireWoods
14      in New York and I don't think Mr. Rodes even knew about
15      that engagement.
16   Q. And what was the purpose of your retention? What did he
17      tell you what was the reason for you to serve as an
18      expert?
19   A. It was to look at the bank's response, Bank of America;
20      did they act in compliance with industry standards in
21      dealing with Life.
22   Q. Anything else?
23   A. That was pretty much the idea, to see about industry
24      standards and the best practices.
25   Q. My understanding also -- we're going to go over it, but

Page 16

1      part of your opinion was also to determine whether the
2      bank can reopen the account?
3   A. Yes, sorry.
4   Q. So do I have a correct understanding what was first was
5      to look at the bank's response?
6   A. Right.
7   Q. Second, did they act in compliance with industry
8      standards?
9   A. Right.
10   Q. And then the third purpose was to determine if the bank
11      accounts can be reopened?
12   A. Or give my opinion on that.
13   Q. Right.
14   A. I have no bearing on whether or not Bank of America
15      opens that account.
16   Q. I understand. I'm going by your report. There's a
17      section in there you --
18   A. Right.
19   Q. How much have you been paid so far in this case?
20   A. Nothing.
21   Q. What's your hourly fee in this case that you're going to
22      charge the law firm that retained you?
23   A. 350 an hour.
24   Q. Have you asked for a retainer upfront?
25   A. No.

Page 17

1   Q. What's your hourly fee for deposition?
2   A. The same, 350.
3   Q. Before we started today, what did you do to prepare for
4      today's deposition?
5   A. I pretty much just read over the statements.
6   Q. Did you speak with anybody else?  Did you speak with
7      anyone at McGuireWoods regarding your deposition today?
8   A. Yes, I spoke with Mr. Rodes and Ms. Bergin.
9   Q. What was discussed?
10   A. Just the statement.
11   Q. Anything else?
12   A. No.
13   Q. You had an opportunity to sit yesterday in the
14      deposition of Mr. Mike Kaszubski, correct?
15   A. Yes.
16   Q. Before you had that opportunity, you had authored the
17      report which we have identified as Exhibit 1, correct?
18   A. Yes.
19   Q. If we can go, please, to page 18, your signature is
20      there, correct?
21   A. Yes, that's my signature.
22   Q. And you dated the report 12/14/2014?
23   A. Yes.
24   Q. In the last sentence there you say, "I reserve the right
25      to modify this report upon further review or any new

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 18

1    information that comes to my attention." Do you see
2    that?
3    A. Yes.
4    Q. Now, going back to my question, you had the opportunity
5    to sit in the deposition of Mr. Mike Kaszubski, correct?
6    A. Yes.
7    Q. After hearing what he had to say yesterday, do you
8    believe that any part of this report could be changed?
9    A. My opinion is the same.
10   Q. Your opinion is the same?
11   A. Right.
12   Q. Is there something that has changed?
13   A. Not particularly.
14   Q. Are you aware of the COZONE -- references to COZONE that
15   Mr. Kaszubski --
16   A. COSO.
17   Q. COSO?
18   A. Yes.
19   Q. Are you aware of it?
20   A. Yes.
21   Q. What is it?
22   A. It's best practices for compliance.
23   Q. What does it entail?
24   A. Again, it sets out, which he articulated yesterday,
25   following a series of best practices and what compliance

Page 19

1    standards should be for policies and procedures.
2    Q. And who is the author of COSO?
3    A. It's a group. I don't recall what the acronym is. It's
4    council of statements or something. It's a council.
5    Q. Do you subscribe to the best practices that are adhered
6    to by COSO?
7    A. Yes.
8    Q. And you learned yesterday that Life For Relief &
9    Development has implemented the internal controls and
10   best practices that's laid out by COSO, correct?
11   A. Yes.
12   Q. You weren't aware of that before yesterday's deposition,
13   right?
14   A. Not specifically, but I was aware from reading his
15   reports that he was implementing policies and procedures
16   on compliance, and in that rebuttal statement I state
17   that in there, that -- if we can look at that for a
18   second, I can point to the exact language.
19         Basically what I said in there is that as
20   an entity, they're a high-risk entity for
21   money-laundering in the banking community, and by virtue
22   of them having established a compliance program and
23   especially the way he was describing it yesterday, that
24   certainly mitigates a lot of that risk, and certainly
25   you've got an inherent risk. Then you've got the

Page 20

1    mitigating factors or the control factors as he talked
2    about, but you still have residual risk after that.
3    Q. Are you aware of other charities that are banking with
4    Bank of America that are also providing humanitarian aid
5    in the same regions and areas as Life For Relief &
6    Development?
7    A. No.
8    Q. That has never been shared with you, that there's
9    another entity out there that's providing humanitarian
10   aid in the same region as Life For Relief & Development?
11   A. The only thing I saw was the reference to the FBI agent,
12   again, in the report, who talked about was that Syria
13   Defense, and other than that, that's all I'm aware of.
14   Q. Are you aware that that entity is still banking with
15   Bank of America?
16   A. Not specifically, no.
17   Q. Are you aware of other entities that are banking with
18   Bank of America that are providing -- or other NGOs that
19   are banking with Bank of America and are providing
20   humanitarian aid in the same region as Life for Relief &
21   Development?
22   A. No.
23   Q. You indicated earlier that now that you know that COSO
24   internal controls are in place that it does mitigate or
25   reduce the inherent risk. Based on that statement,

Page 21

1    would that change your opinion for Bank of America to
2    consider opening its account for Life For Relief?
3    A. No, because you still have the issues of the
4    transactional activity that was at play and the fact
5    that they maintain accounts at numerous banks. That
6    creates a risk for Bank of America.
7    Q. Let's assume this hypothetical, that all the accounts
8    will be in one bank.
9    A. Okay.
10   Q. And let's assume that the transactional activities were
11   addressed and they were all related to charity purposes,
12   okay? Let's assume that. That's my hypothetical.
13   A. Okay.
14   Q. Based on the two assumptions that I've given you, would
15   that change your opinion in allowing Life For Relief &
16   Development to bank with Bank of America?
17         MR. RODES: Objection. In the way that you
18   framed your question, it seems to exceed the scope of
19   his testimony as an expert. He's not testifying as a
20   representative of Bank of America.
21         MR. AKEEL: No, he's not. In Section L,
22   where he gives an opinion regarding the consideration to
23   open the Life For Relief bank account, I think I can
24   probe into that, the biases, and determine that.
25         MR. RODES: You just have to rephrase the

6 (Pages 18 to 21)

Dennis Lormel
12/16/2014

Page 22

1    question.
2    Q. (By Mr. Akeel): I'll go back and posit my hypothetical.
3        Assume that Life For Relief & Development has comfort
4        that its bank accounts won't be closed, they can put all
5        their accounts in one bank and it will be Bank of
6        America. That's one hypothetical, okay? Assume the
7        transactional activities that you had questions about
8        were all addressed and they are all charity corporate-
9        related, okay? So far so good?
10   A. Yes.
11   Q. And assume that you have the knowledge that COSO
12       internal controls are in place at Life For Relief &
13       Development, okay?
14   A. Yes.
15   Q. Based on what I have just posited to you, would you give
16       a recommendation that you don't -- that Bank of America
17       can open the account because the inherent risks are
18       acceptable and reasonable?
19   A. We have to look beyond that, possibly. Possibly,
20       because yes, the risk factors have been mitigated, but
21       you have other factors that need to be considered here,
22       too.
23   Q. What are they?
24   A. Well, what you're dealing with here are compliance
25       policies and procedures. You're not dealing with

Page 24

1    due diligence perspective I would have trouble with.
2    Q. Who are you referring to? Are you saying the person
3        that you're referring to in the report is Muthanna
4        Al-Hanooti?
5    A. Yes.
6    Q. Do you have knowledge he was employed with Life at that
7        time when he was indicted?
8    A. According to what I read he was.
9    Q. And where did you get your source from? Where did you
10       read?
11   A. I went out to Google and then I saw -- I think they're
12       referenced in here, a series of newspaper articles, one
13       being the Wall Street Journal, I think, mentioned it at
14       one point, but there was a specific newspaper article
15       that talked about that. I went on a website that I go
16       to frequently.
17   Q. What's the website?
18   A. The Investigative Project.
19   Q. Is that authored by Mr. Steve Emerson?
20   A. Yes.
21   Q. Are you a subscriber to The Investigative Project?
22   A. I receive it. I don't pay any subscription. I receive
23       it regularly, though. Let me rephrase. I get -- what I
24       receive from The Investigative Project are news clips.
25       They put together occasional news clips on terrorist

Page 23

1    transactional activity. We're not talking about
2    money-laundering. What you've got to consider is the
3    account activity, how money goes into the account;
4    again, the sources and everything. I haven't heard one
5    word about any anti-money-laundering considerations,
6    training or the patterns of deposit activity. Those
7    things would all factor in there, the fact that they
8    operate in a high-risk zone the way they do, and I give
9    you guys credit. I think certainly in the areas of the
10   world that they operate in, we need humanitarian aid,
11   but what you showed me yesterday -- or what I listened
12   to yesterday during that deposition was all about
13   internal controls and policies and procedures. It had
14   nothing to do with money-laundering.
15       From a broader picture, I would have a
16   problem recommending unless I knew more about the
17   money-laundering procedures or the steps taken to
18   mitigate the potential money-laundering, and certainly
19   for terrorist financing in those regions, which I don't
20   see in it. In this report I mentioned that I did a very
21   limited due diligence check when I was checking the
22   Internet and I saw the reference to a case -- whatever
23   period it was, involving an individual that used to work
24   for them who was indicted and convicted for terrorist-
25   related charges. That to me is something that from a

Page 25

1    finance, terrorism and money-laundering specifically. I
2    get that. I use that in my practice. That's stuff I
3    use for other business purposes. I go out to his
4    website because they have a lot of court cases and
5    things out there, historical documents.
6        MR. RODES: I'll point out on number 95 on
7    page 21 he references the indictment of Mr. Al-Hanooti.
8        MR. AKEEL: The document speaks for itself.
9    I'd like to mark this as Exhibit 2.
10       (Whereupon Deposition Exhibit No. 2
11       was marked for identification.)
12   Q. (By Mr. Akeel): Are you aware that the Lexus Nexus has
13       a program out there that provides powerful tools to see
14       who is on the terrorist watch list and to be able to
15       provide background information regarding entities that a
16       charity can deal with? Are you aware of it?
17   A. Yes.
18   Q. Have you consulted that?
19   A. With that particular, no.
20   Q. Have you ever consulted Lexus Nexus?
21   A. Yes.
22   Q. To do background checks?
23   A. Yes.
24   Q. Have you done that for Life For Relief?
25   A. No.

7 (Pages 22 to 25)

Dennis Lormel
12/16/2014

Page 26

1  Q. Why not?
2  A. I don't subscribe anymore. I used to subscribe to Lexus
3     Nexus so I would regularly go out and do that. I don't
4     do that now.
5  Q. Is Mr. Emerson a friend of yours?
6  A. I know him, yes.
7  Q. You guys are personal friends?
8  A. I'll say yes. We're more acquaintances than friends.
9     We know each other.
10 Q. You have a high respect for him?
11 A. I have respect for him. I have guarded respect for him.
12 Q. What do you mean "guarded"? You said guarded?
13 A. Yes.
14 Q. Why is that?
15 A. I think he's very committed. I think he's well-
16    intended, but I also think he's a bit biased.
17 Q. What do you mean by that?
18 A. I think he has an ethical bias.
19 Q. Can you expand on that, please?
20 A. At times I think his reporting is not as objective as it
21    should be.
22 Q. When you say he's biased, what do you mean? Who is he
23    biased against, Arabs?
24       MR. RODES: Calls for speculation, lacks
25    personal knowledge. He's not in Mr. Emerson's head.

Page 27

1  Q. (By Mr. Akeel): He's biased. What is he biased
2     against? Who is he biased against? You're under oath,
3     sir.
4        MR. RODES: Objection; lacks foundation. You
5     haven't established that he's actually shared those
6     thoughts with him.
7  Q. (By Mr. Akeel): From your perspective, who is he biased
8     against?
9  A. Pretty much organizations like Hezbollah, Hamas and
10    people he believes are associated with them.
11 Q. Do you believe he is biased towards persons of Arabic
12    origin?
13       MR. RODES: Same objections.
14       THE WITNESS: Again, when it comes to certain
15    organizations, I use a number of those types of think tanks.
16 Q. (By Mr. Akeel): Do you believe he is biased towards
17    persons who subscribe to the religion of Islam?
18       MR. RODES: Same objections.
19 Q. (By Mr. Akeel): Muslims?
20 A. That's a hard question to answer because again, I think
21    it's more driven by where he sees associations with
22    certain organizations, and my point was that I think he
23    lacks objectivity sometimes when it comes to that.
24 Q. Are you familiar with what I'm going to give you? Have
25    you seen Exhibit 2 before, where it says, "About The

Page 28

1  Investigative Project on Terrorism"? Have you seen this
2  before?
3  A. No, I haven't.
4  Q. If you look down, you see your statement there?
5  A. Yes.
6  Q. "Steve Emerson and The Investigative Project do a
7  terrific job and IP is a good repository for
8  information."
9  A. Yep.
10 Q. "My experience with IP is that they have been very
11 methodical and very detail-oriented in developing their
12 information. They can look at an organization,
13 particularly a complex organization, and through public
14 source information identify potential terrorist threats
15 and possibly links to terrorism. Dennis Lormel, Former
16 Chief of Terrorist Financing Operations at the FBI." Do
17 you see that?
18 A. Yes.
19 Q. Do you agree you made that statement?
20 A. I certainly did.
21 Q. Are you aware that there's a lot of criticism about
22 Mr. Emerson, that he's created a lot of Arab-American
23 fear, hysteria -- where he has created hysteria among
24 mainstream Americans towards persons of Arab origins?
25 Are you aware of that?

Page 29

1        MR. RODES: Vague as to causing hysteria.
2  Q. (By Mr. Akeel): Go on.
3  A. No, but I know that we're going back to -- where I take
4     a step back is I know that he is very vocally outspoken
5     against CAIR.
6  Q. CAIR is the acronym for Council of American Islamic
7     Relations?
8  A. Right.
9  Q. Now, besides using The Investigative Project as a
10    resource for your information, what other entities that
11    you use as a resource for information about
12    Arab-Americans or Muslims?
13 A. A number. I use the Mid East -- it's not the Mid East.
14    Washington Institute for -- I think it's Near East
15    Policy. I use a number of those types of think tanks.
16 Q. It's called Washington Institute for Near East Policy?
17 A. Something to that effect. Washington Institute, you
18    will find it.
19 Q. Is that run by Daniel Pipes? Do you know Daniel Pipes?
20 A. No, I don't believe it is. I don't know if it is or
21    isn't.
22 Q. What else?
23 A. There are a few of the think tanks I look at quite a
24    bit.
25 Q. What other think tanks?

8 (Pages 26 to 29)

Dennis Lormel
12/16/2014

Page 30

1  A. Off the top of my head I don't remember, but I look at
2     two or three.
3  Q. There's another reference that I've seen in your --
4     MilitantIslamMonitor.org?
5  A. The one time -- I've only looked at that one time and
6     that was when I was doing my research here and
7     references came up to the case I referenced.
8  Q. I understand. I'm looking at your Exhibit 1, and if I
9     look at your Exhibit 3, which is page -- if I look at
10    your Exhibit 1, it's titled, "Items Relied
11    Upon/Reference Manual." Do you see that?
12 A. Where is it?  I'm sorry.
13 Q. That's on page 19.
14 A. Okay. Yes.
15 Q. If you look at item 92, you make a reference to
16    Military (sic) IslamMonitor.org. Do you see that?
17 A. Right.
18 Q. Are you a regular subscriber to --
19 A. I just answered --
20 Q. Let me finish, please. You said you went to the website
21    one time, but are you a subscriber? Are you a member in
22    the MilitaryIslam (sic).org.
23 A. No. Can we stop for a second? I'd like to ask to go
24    back. We never really finished a question you left
25    open-ended and you started asking another question.

Page 31

1  Q. I get to ask the questions, sir, and I get to determine
2     how the deposition goes. If your attorney will want to
3     ask a question about it, that's fine.
4  A. Okay.
5  Q. I want to go back to Military (sic) IslamMonitor.org.
6     It seems to me that that's a reference or an item you
7     relied on in forming your opinion, correct? You
8     referenced it.
9  A. It was one item that I went out and picked up on there.
10    As I mentioned, I've been on that website a total of one
11    time.
12 Q. But in forming your opinion you draw on sources to
13    advocate a position that you hold, correct?
14 A. Yes.
15    MR. AKEEL: I'd like to mark this as
16    Exhibit 3.
17    MR. RODES: Can we take a one-minute break
18    here?
19    MR. AKEEL: Sure.
20    (Whereupon Deposition Exhibit No. 3
21    was marked for identification.)
22    MR. AKEEL: We're back on the record.
23 Q. (By Mr. Akeel): Sir, you understand you're still under
24    oath?
25 A. Yes.

Page 32

1  Q. What was discussed outside in the hall?
2  A. We just -- Counsel asked me about my concern --
3     MR. RODES: You can answer that question.
4     THE WITNESS: My concern about the question
5     that I wanted to go back and answer.
6  Q. (By Mr. Akeel): What else?
7  A. That was it.
8  Q. What was that question?
9  A. You had asked about Steve Emerson. You had given me
10    Exhibit No. 2 and you pointed out my quote in here where
11    I said Steve Emerson and The Investigative Project do a
12    really terrific job and the IP is good repository for
13    information.
14    My experience with the IP is that they have
15    been very methodical and very detail-oriented in
16    developing their information. They can look at an
17    organization, particularly a complex organization, and
18    through public source information identify potential
19    terrorist threats and possible links to terrorism.
20    The reason I wanted to go back to address
21    this, you handed me this. This particular quote goes
22    back to around 2005 or 2006, and at that time this was
23    very accurate. This was true. Since that time,
24    particularly in the last couple of years is when I said,
25    "You know what? Steve may not be as objective as he

Page 33

1  should be," but it still doesn't change the fact that
2  they do very good -- when they're on point, they do very
3  good work.
4  Q. That's why, sir, I gave you a softball in the beginning.
5  I'm asking you what you mean he's not biased anymore.
6  There's no trick questions here. When you say he's
7  biased today, I didn't get a clear answer. What do you
8  mean? If you want to tell me, what is he biased towards
9  today that you believe? I'm not going to his state of
10 mind, but what you believe.
11 A. And I answered that question.
12 Q. You said in organizations.
13 A. Yeah. I said he was particularly biased against
14 organizations like Hamas, Hezbollah. He carries that to
15 al-Qaeda, but in his dealings with that -- and you can
16 bring in the Muslim Brotherhood. And in my view he's
17 gone overboard as he looks at more people as being
18 associated perhaps with Brotherhood than they really
19 are, but that doesn't -- I don't know -- and I don't
20 know if he's absolutely biased or just, as I said he's
21 got those biases.
22 Q. Well, I'm going into the things that you're -- where
23 your name comes out and you refer to them. You refer to
24 them as some sort of authority in some capacity. I'd
25 like to talk about Exhibit 3, which says,

9 (Pages 30 to 33)

Dennis Lormel
12/16/2014

Page 34

1  "MilitantIslamMonitor.org." This is noted as footnote
2  92 in your report, which is Exhibit 1. Do you see that?
3  A. Yes.
4  Q. It says here -- I'm looking at the first page. I go to
5  their website and it says, "About Militant Islam
6  Monitor. The war on terror is World War IV. Welcome to
7  MilitantIslamMonitor.org. Our mission is to provide an
8  online resource documenting the activities and
9  identities of Islamist individuals and groups in the
10  United States and abroad." Do you see that?
11  A. No, I don't have it in front of me.
12  Q. You go to that website, that's what you see right
13  upfront, right?
14  A. Uh-huh.
15  Q. Do you remember seeing that?
16  A. No, I didn't look at that.
17  Q. You didn't see the very -- when you type in
18  MilitantIslamMonitor.org, you didn't see that as the
19  first page?
20  A. That wasn't what I was looking for, no.
21  Q. No. Sir, I'm asking you --
22  A. Yes, I saw that as the first page. I did not read this.
23  If I had read this, this would not be in the report.
24  Make no mistake about it, this would not be in the
25  report.

Page 35

1  Q. Well, let's look at the next one where it says -- maybe
2  perhaps this will refresh your recollection. It says,
3  "What is militant Islam? Militant Islam is a utopian
4  ideology inflated in the 20th century that attracts only
5  a portion of Muslims. 10 to 15 percent seek to gain
6  control of governments and is nakedly aggressive towards
7  all those who stand in its way no matter what their
8  faith, unnoticed by most westerners. Militant Islam has
9  unilaterally declared war on Europe and the United
10  States. The enemy in this war is not terrorism, but
11  Militant Islam. Dr. Daniel Pipes, Militant Islam
12  reaches America." Do you see that?
13  A. Yes.
14  Q. Do you remember reading that?
15  A. No. As I said, I did not read that.
16  Q. I'm asking if you remember reading that.
17  A. No, I didn't.
18  Q. Let's go to the next one. "After September 11, everyone
19  in America knows full well the power and persistence of
20  these militant radical groups. Is (sic) a certainty
21  that the terrorists already living among us will
22  continue to pursue their destructive agenda. Steve
23  Emerson, American Jihad." Do you see that?
24  A. Yes.
25  Q. Do you remember reading that?

Page 36

1  A. No.
2  Q. Well, do you believe that Life For Relief & Development
3  is part of this network to take over the government?
4  A. Absolutely not.
5  Q. Let's go to the next page, page three. Just for the
6  sake of convenience, I put the numbers on the bottom
7  right. I went to the website to look for Life For
8  Relief because obviously you referred to
9  MilitantIslamMonitor.org, and it states, "Ghanim Al
10  Jumaily, director of al-Qaeda-linked charity Life For
11  Relief & Development, Saddam loyalist, appointed Iraqi
12  ambassador to Japan, worked as a NASA engineer." My
13  question is, sir, do you have any evidence that Life For
14  Relief & Development is linked to al-Qaeda?
15  A. No.
16  Q. Let's go to page six. It's again the website you relied
17  on and put in as a reference, MilitantIslamMonitor.org.
18  There's a reference to, "Obama's White House had
19  hundreds of visits from Muslim radicals." Do you see
20  number six?
21  A. Yes.
22  Q. Do you believe our president of the United States is
23  affiliated with radicals?
24  A. No.
25       MR. RODES: I'm going to object to this line

Page 37

1  of questioning and to the rest of the document in terms
2  of you have not established a foundation that he
3  actually looked at any of these pages or asked him what
4  pages he's looked at.
5  Q. (By Mr. Akeel): Do you remember seeing references to
6  the president of the United States linked to radicals?
7  A. No.
8  Q. Let's go to the next one, page eight, "No Arabs, no
9  terror." Do you see where it states that up top?
10  A. Yes.
11  Q. "Arab Muslim savages murder four, injure 13 in synagogue
12  attack using guns, axes and knives in Har Nof." Do you
13  remember seeing that article?
14  A. No.
15  Q. Let's go to the next one, page 10. In the same website
16  that you relied on, MilitantIslamMonitor.org, "They must
17  go. Arab terrorist murders three-month-old Jewish baby,
18  injures eight in car attack." Do you remember seeing
19  that in the website you relied on?
20  A. No.
21  Q. Let's go to page 12. "Arab 'Rock Terrorism'" continues
22  to kill and injure Israelis daily." Did you see that
23  when you relied and made reference to
24  MilitantIslamMonitor.org?
25  A. No.

10  (Pages 34 to 37)

Dennis Lormel
12/16/2014

Page 38

1  Q. Let's go to page 13. "Lehave Group Tells Supermarket
2     Targeted by Terror - Stop hiring Arab Fifth Columnists."
3     Do you remember seeing that in the website that you
4     relied on, MilitantIslamMonitor.org?
5  A. No.
6  Q. Let's go the last one, 14. "Arabs Out! Israeli Arab
7     Muslims, You Take Smiling Selfies In Front of Jews
8     Wounded in Terrorist Attack."  Do you remember seeing
9     that article when you relied on the website
10    MilitantIslamMonitor.org?
11          MR. RODES:  Objection; assumes facts not in
12    evidence.  You haven't established that he relied on any
13    of this.
14          MR. AKEEL:  I'm asking a question.
15          MR. RODES:  And I object to it.
16          THE WITNESS:  No.
17 Q. (By Mr. Akeel):  Are you aware that Life For Relief &
18    Development is run by Arab-Americans?
19 A. Yes.
20 Q. You're aware that Bank of America knew that?
21 A. Yes.
22 Q. And you knew that from the deposition, correct?
23 A. Which deposition?
24 Q. Of Ms. Marshall.
25 A. Yes.

Page 39

1  Q. Now, I understand -- I mean, you understand as an expert
2     I'm entitled to probe into your biases and prejudices?
3     You understand that?
4  A. Yes.
5  Q. Do you view the persons of Arabic origin -- now, you're
6     under oath, right?  You know that?
7  A. (Nods head up and down.)
8  Q. Is that yes?
9  A. Yes, I know I'm under oath.
10          MR. RODES:  Asked and answered.
11          MR. AKEEL:  I just want to make sure.
12          MR. RODES:  How many times are you going to
13    ask him that?
14 Q. (By Mr. Akeel):  Do you have some internal belief or
15    some kind of -- I don't know if it's a belief or
16    settlement -- or sentiment or philosophy that persons of
17    Arabic origin tend to be a more violent or more
18    aggressive or less peaceful?
19 A. Absolutely not.
20 Q. My understanding is that you were part -- there was a
21    period of time where you worked with NYPD; is that true?
22    Were you working with the police force in New York?
23 A. Yes.  I was an FBI supervisor and New York detectives
24    worked for me.  I started a task force involving the New
25    York police and U.S. Secret Service.

Page 40

1  Q. Did the task force include training informants to
2     penetrate the Arab and Muslim-American community?
3  A. No.  We were working financial crimes, bank fraud.  We
4     were going after bank fraud cases.  Had absolutely
5     nothing to do with ethnicity.
6  Q. Were you aware of the controversy regarding NYPD,
7     regarding their aggressive tactics towards the Arab and
8     Muslim-American community in New York?
9  A. Yes, but let's put this in context.
10 Q. I'm asking if you're aware.
11 A. Yes.
12 Q. What are you aware of?
13 A. I'm aware that the New York Police Department started an
14    intelligence or counter-terrorism division, and as part
15    of that initiative they initiated an intelligence
16    program to go out and gain intelligence on the Islamic
17    community.
18 Q. And were you involved or did you play a role in any way
19    during that program?
20 A. No.
21 Q. Did you provide any consultation or any advice during
22    the formation of that program?
23 A. No.  Let me qualify something.
24 Q. Sure.
25 A. When they first established the intelligence branch or

Page 41

1     the counter-terrorism branch at the New York PD, I was
2     still in the FBI and some of their high-ranking
3     officials came down to FBI headquarters and I did
4     provide a briefing to them on terrorist finance, but
5     that's the extent of any involvement I've ever had with
6     them.
7  Q. Who is "them"?  Who did you provide the briefing to?
8  A. The captain for the New York Police Department.  I don't
9     recall his name.
10 Q. Did you provide any written material?  Was it a written
11    presentation?
12 A. No, it was just a meeting and briefing.
13 Q. How many meetings were there?
14 A. That was the one meeting I had, just one.
15 Q. Based on that meeting, did they -- do you know if they
16    implemented any -- did you provide any recommendations
17    in that meeting?
18 A. In terms of terrorist financing, yes, but they didn't do
19    anything.  When it came to terrorist financing,
20    everybody wanted to chase bullets and bombs and not go
21    after money, so they probably didn't do anything with
22    that, anything I recommended.
23 Q. So you don't know with certainty if they did or didn't?
24 A. I would say with certainty they didn't.
25 Q. Back to my question regarding Lexus Nexus, were you

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 42

1    aware that Life For Relief & Development uses Lexus
2    Nexus to check for potential threats and potential
3    terrorists?
4    A. No.
5    Q. You learned that yesterday, right?  Did you learn that?
6    A. I don't recall hearing that yesterday.
7    Q. Did you learn it from the deposition of Mr. Alomari?
8    You read it, right?
9    A. Yes.
10   Q. Do you remember reading that part?
11   A. No, I'm sorry, I don't.  I don't discount it, that's for
12   sure.
13   Q. Well, knowing that, would that increase your confidence
14   that Life For Relief & Development is engaging in all
15   efforts to make sure that it reduces any -- that
16   inherent risk, given that it provides humanitarian aid
17   in areas where humanitarian suffering is in dire
18   straights?
19   A. I think that's a good step, yeah.
20   Q. Would that change your opinion or would that increase
21   your confidence in making a recommendation to Bank of
22   America that, "Hey, you may want to look at Life For
23   Relief and open its bank accounts because they are
24   addressing the inherent risks"?
25   A. It would help my comfort level, yes.

Page 43

1    Q. During your tenure with the FBI, did you ever prosecute
2    Arab-Americans?
3    A. If we put this in a proper context, as an FBI agent I
4    didn't prosecute anybody.  I investigated.  The
5    prosecuting attorneys, either the U.S. Attorney's office
6    or the Department of Justice, prosecuted.
7    Q. Did you aid in the prosecution of Arab-Americans?
8    A. Yes.
9    Q. Approximately how many?
10   A. That's a difficult question because I was a section
11   chief responsible for overall a lot of cases.  It's hard
12   to quantify in terms, but certainly I had a hand and my
13   people had a hand in the Holy Land Foundation,
14   Benevolence International, cases like that.
15   Q. Kind Hearts in Ohio?
16   A. Kind Hearts went down I think after I retired, but
17   certainly investigating them, yes.
18   Q. So we have three?
19   A. At least, and then you have individuals.  You've got the
20   9/11 hijackers.  I certainly was involved to a very
21   large extent with that.  Zacarias Moussaoui would have
22   been in that, a guy named Ali Alamari.
23   Q. Ali Alomari?
24   A. Alamari.
25   Q. How do you spell the last name?

Page 44

1    A. I think it was A-l-i-m-a-r-i (sic).  I'm sure there were
2    others.  Those come to my mind.  I was not directly
3    involved, but I oversaw a lot of the investigative
4    activity that went on that would have led to those
5    people.
6    Q. Al-Baarat?
7    A. Yes.
8    Q. You were involved in that?
9    A. Yes.
10   Q. Any of the entities that you prosecuted were found
11   innocent or were they all guilty?
12   A. I think at the end of the day, Al-Baarat -- there was
13   never a prosecution of Al-Baarat.  There was just, I
14   think, sanctions.  There may have been some individuals
15   that were prosecuted in that case, but as an entity,
16   Al-Baarat, no.
17   Q. You're aware that there was a monolith that was written
18   and was given to the September -- the 9/11 commission
19   in the Senate.  You are aware of that?
20   A. Yes.  In fact, if I may, I was interviewed extensively
21   for that.
22   Q. Were you aware of the findings there that they did not
23   find a scintilla of evidence of terrorist financing from
24   American Muslim or American Arab charities going
25   overseas?  Are you aware of that finding?

Page 45

1    A. Yes.
2    Q. Now, do you know how they came up with that finding?
3    A. Some of the information they got from me.
4    Q. Is there any transcript that I can look at where I can
5    see where you state to the Senate panel that, "Through
6    our investigation, as a section chief in the FBI, we
7    could not find a scintilla of evidence of terrorist
8    financing from American Muslims or American Arab
9    charities"?
10   A. Well, let's put this in context.
11   Q. I'm just asking.  Would I see it?  Can I see a
12   transcript?
13   A. I don't know about a transcript because I didn't have
14   that.  The 9/11 commission would have that, but my name
15   is footnoted in that monolith.
16   Q. Now, that was a commission panel --- that was a
17   recommendation that was made to the Senate, correct?
18   A. Recommendation made -- I don't understand the question.
19   Q. I will withdraw that question.  After that finding by
20   the commission that there was not a scintilla of
21   evidence of terrorist financing from Arab or Muslim
22   charities, after you made that statement, has that
23   statement -- do you still agree with that finding as you
24   sit here today?
25   A. I think you mischaracterized my answer before, because

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 46

1 you're saying I made a statement.
2 Q. I didn't mean to do that. Let me ask the question.
3 After the finding that was made in the monolith where it
4 was determined that there was not a scintilla of
5 evidence of terrorist financing from American or Muslim
6 charities going overseas, as you sit here today, do you
7 still agree with that finding?
8 A. No.
9 Q. Why not?
10 A. Holy Land Foundation was prosecuted. They were
11 prosecuted for providing material support. I don't
12 recall exactly what all of the circumstances were and I
13 believe that there were some other cases where monies
14 did go over, but by and large I do agree that -- and for
15 instance, if I may use an example here, the SAAR
16 Foundation, they were front and center right after I
17 think it was in 2003. Homeland Security investigations
18 went out and they executed search warrants at a number
19 of locations in Herndon, Virginia, that got national
20 attention. I think it was around March of 2002 or 2003.
21 I was dead set against that. I didn't believe the SAAR
22 Foundation to be funding terrorism and that's why a few
23 years after my retirement I wound up as a consultant to
24 them.
25 Q. So other than the Holy -- do you know with certainty as

Page 47

1 you sit here today that there was any finding made in
2 that case that there was any terrorist financing from a
3 charity in America going overseas?
4 A. I don't recall what the specific final -- there was a
5 prosecution. They were prosecuted for material support.
6 Q. Other than Holy Land, have you come across any American
7 charity -- or any Arab-American charity or Muslim
8 charity that engaged in terrorist financing?
9 A. Kind Hearts. Again, I don't recall the specifics, but
10 other than maybe that, no.
11 Q. Were you aware that the judge in the Kind Heart case
12 made a finding that its constitutional rights were
13 violated?
14 A. No, I wasn't aware of that.
15 Q. Do you have any evidence as you sit here today that Life
16 For Relief & Development has engaged in any terrorist
17 financing?
18 A. No.
19 Q. As you sit here today, do you have any evidence that
20 Life For Relief & Development has engaged in any --
21 where you confirmed it, in any money-laundering scams?
22 A. No.
23 Q. Do you view people with suspicion when you hear them
24 say, "Allah"?
25 A. No.

Page 48

1 Q. Do you know what that means?
2 A. Allah?
3 Q. I'm sorry? Yeah, Allah, A-l-l-a-h. Do you know what it
4 means?
5 A. Specifically, no. I know it's reverent is the way I
6 look at it. Allah, God.
7 Q. Do you equate Allah with God as we say God in English?
8 A. Yes.
9 Q. Do you view Allah as a separate deity?
10 A. No.
11 Q. I'd like to go over -- we can take a five-minute break
12 right now and then we'll come back and go over your
13 report.
14 (Break in proceedings.)
15 Q. (By Mr. Akeel): Sir, you understand you're still under
16 oath?
17 A. Yes.
18 Q. You know, I want to go into kind of your report, but I
19 want to get an understanding of the
20 anti-money-laundering procedures that you would expect
21 an organization to have. Can you please explain to me
22 what type of controls that should be in place, the best
23 practices to mitigate or to reduce the possibility of
24 money-laundering activities?
25 MR. RODES: I'm going to object to the extent

Page 49

1 it's outside the scope of the testimony for which he's
2 been designated.
3 MR. AKEEL: No. In his rebuttal he said
4 there aren't any -- he discusses it.
5 Q. (By Mr. Akeel): So I would like to know what
6 money-laundering controls that you believe an
7 organization should have.
8 MR. RODES: Same objection.
9 THE WITNESS: When you say organization, are
10 you talking about Life?
11 Q. (By Mr. Akeel): Any.
12 A. Well, they're very different. What are you talking
13 about?
14 Q. Let's talk about an organization that has a bank account
15 with Bank of America, a corporate -- a profit
16 organization or not-for-profit. Unless you see a
17 distinction in those two, please define them.
18 A. Start out here: Banks are required -- or financial
19 institutions or companies that have been designated
20 financial institutions are required to have an
21 anti-money-laundering program. Companies like Life or
22 other companies that are not regulated that way aren't
23 required to have an anti-money-laundering program.
24 Q. What is -- go on.
25 A. In response to your question and in response to looking

13 (Pages 46 to 49)

Dennis Lormel
12/16/2014

Page 50

1    at those reports, those reports talk about policies and
2    procedures, compliance controls. They didn't address
3    money-laundering. That was my point.
4    Q. What controls should be -- that you would expect to see
5       to address money-laundering?
6    A. A couple of things here. You have to look at money
7       coming in, money going out. In terms of money coming
8       in, is it legitimate? So what are the sources of your
9       funds? And then again from the organizational
10      standpoint, you've got -- when you have checks or money
11      wires that are coming in or whatever, that's simple; it
12      goes right to the bank. When you're dealing with cash,
13      and yesterday we heard about the procedures and the
14      controls on what you're doing with cash, but what kind
15      of training, what kind of mechanisms do you have in
16      place or the controls that you have in place in terms of
17      putting that money into a financial institution? And
18      are you fully aware of the ramifications of certain
19      types of transactional activities? That's one.
20         And then it's the money going out. Again, is
21      it going for the purposes that it's intended to be? If
22      I take a step back and I want to look at you from a
23      standpoint of anti-money-laundering, what I'm going to
24      do is I'm going to look at your organization and I'm
25      going to say, "Is the activity I've seen flowing in and

Page 51

1    flowing out reasonable for that type of business?"
2    Q. Okay. So I'm just trying to be very specific about one
3       thing right now. Let's address regarding the
4       anti-money-laundering, the sources first, and
5       then we will go to the uses. Let's talk about the
6       sources first.
7          You identify -- I mean, basically there's
8       three ways we know -- put aside like-kind exchanges, in-
9       kind donations, blankets, pillows. Do you believe
10      that's part of money-laundering as well?
11   A. Trade base money-laundering, it could be. In general,
12      yes. In terms of an entity like Life, no.
13   Q. So can we focus on cash with respect to sources when
14      we're looking at an anti-money-laundering program, okay,
15      in that context?
16   A. Okay.
17   Q. Now, wires, I think that's addressed because we know who
18      the identity of the person is; is that fair enough?
19   A. For the most part. Again, less of a problem like this,
20      but you always --
21   Q. Like Life?
22   A. Yes, but you always have a challenge understanding or
23      knowing what the actual source of the funds are. That's
24      an industry-wide problem.
25   Q. To narrow it more in scope, let's just talk about an

Page 52

1    organization like Life.
2    A. Okay.
3    Q. So the wiring, there's adequate controls, right?
4    A. Yes.
5    Q. The second method of source is checks. Do we agree that
6       there's adequate controls there?
7    A. Yes.
8    Q. So the third item, and that's the issue, is the cash,
9       correct?
10   A. Yes.
11   Q. For an organization like Life, correct?
12   A. Yes.
13   Q. Do you have a threshold percentage in your mind when
14      you're approaching this issue here? Let's say I look at
15      the total amount of sources that come in an organization
16      like Life, let's say 100 million. In cash -- I'm just
17      giving you a hypothetical here, or an example. Of the
18      100 million, the cash that they collect is less than one
19      million. Let's say there's a one-percent makeup of the
20      funds that are coming in. Does that increase your
21      concern, lower your concern or does that play into your
22      consideration at all on whether that's an issue or not?
23   A. Well, again, you're speaking hypothetically?
24   Q. Yes.
25   A. Based on the hypothetical you just gave me, no.

Page 53

1    Q. No what?
2    A. It wouldn't be. I wouldn't consider it that big of a
3       concern with the totality of the money you're talking
4       about. However, when you factor that with other
5       factors, then it could well be and would be a problem.
6    Q. I'm talking from a conceptual perspective right now.
7       Let's say $100 million of sources come in. Let's say
8       the wires are 50 million and the checks that come in are
9       49 million, so we have one million left in cash. In
10      that context, that wouldn't be a concern, correct?
11   A. Probably correct, but it would possibly be a concern for
12      the manner in which it was deposited. If it was being
13      deposited into my bank, is there a consistent pattern?
14      Is there an inconsistent pattern? Are there patterns
15      that appear to be evading reporting requirements? Even
16      though you're dealing with a much more de minimus
17      amount, those things would be a concern. If all of the
18      banking was done with one bank, it probably would not be
19      a concern.
20   Q. I was going to get to that next hypothetical. Let's
21      assume all the sources were all going to one bank
22      because the bank has opened its doors and the bank has a
23      big picture of all of the money coming in from the wire,
24      the checks and the cash. And I again propose the
25      percentage makeup here where 50 million is wire, 49 is

14 (Pages 50 to 53)

Dennis Lormel
12/16/2014

Page 54

1   in checks and one million is in cash.  In that context,
2   as I understand it from your testimony, your concern of
3   money-laundering activity is much less?
4   A. Yes.
5   Q. Now, you heard the testimony of Mr. Kaszubski yesterday
6   regarding the controls that are in place in cash-setting
7   situations, correct?
8   A. Yes.
9   Q. You heard that there are two people that count the
10   money.  They cross-pollinate and it's all confirmed with
11   a third person to determine exactly how much.  Do you
12   have a problem with that so far?
13   A. No, I think that's a good procedure.
14   Q. Is that from your definition an anti-money-laundering
15   control?
16   A. I would call that more fraud control.  It's not
17   necessarily an anti-money-laundering control.
18   Q. We're still on first base here.  Let's stay in that
19   context.  Let's say from your perspective you wanted to
20   implement an anti-money-laundering control in that
21   scenario.  What could be done more to alleviate your
22   concern?
23   A. You've got the cash.
24   Q. Right.
25   A. You have your fraud controls because you have a check

Page 55

1   and balance, because you have three people, so no one
2   person has the ability to siphon any of the money.  Now
3   it's a matter of the money being deposited in the bank.
4   What are your procedures to put the money into the bank?
5   Q. Before we get to that, I'm just talking right now at
6   that first juncture right now.  Is there anything from
7   your perspective that can be enhanced at this level
8   right now?
9   A. No, I would think that that was pretty -- that would be
10   adequate.
11   Q. Let me explore that further.  Isn't it comforting to you
12   that when you have three people, that it would
13   require -- I'm sorry, three people to collude to bring
14   in cash.  As I understand laundering, it's dirty money
15   and you're trying to make it clean through an
16   organization, correct?
17   A. Yes.
18   Q. That you have three people that are at first base there
19   right in the beginning collecting the cash,
20   cross-pollinating, cross-checking, that it would require
21   all three to collude to bring if it's ill gotten gains
22   money?  So isn't that, by the fact there's three people,
23   not just one person, that that is a form of an
24   anti-money-laundering control because three of them
25   would have to collude to put dirty money in the bank?

Page 56

1   Because here you have a situation where one will say,
2   "No.  Hey, where did you get that money from?"  Do you
3   agree with me in that context that that is a form of
4   anti-money-laundering control?  Do you understand where
5   I'm coming from?
6   A. Yes.  Yes.
7   Q. Do you agree with me?
8   A. Yes.
9   Q. So based on the -- again, I'm engaging in -- there's no
10   trick questions.  This is a candid discussion here.  A
11   deposition doesn't have to be -- part of it is to
12   discover information and to explore ways to improve
13   something.  We're at first base, which is collecting the
14   cash.
15        Now, the next level is going to the bank.
16   In that context -- you heard Mr. Kaszubski stating, "We
17   have a policy.  We want our men -- or we want our
18   fundraisers to go right to the first bank because
19   they're a target for theft, to be robbed, and we also
20   want to keep our deposits separate for -- to fulfill the
21   intent of the donor."  If one donor wants to give 2,000
22   for an orphanage, let's say in the Syrian relief
23   program, and another donor wants to deposit 1500 for a
24   water well in Syria, and they keep those deposits
25   separate and they go to the bank, as part of the

Page 57

1   control, the most immediate bank, do you view that
2   procedure as reasonable now knowing the context?
3   A. Well, are they depositing the money into the same
4   account?  Are they depositing money into multiple
5   accounts?
6   Q. In the same account at Bank of America.
7   A. Okay.  Under the scenario you gave me, that would be
8   reasonable.  However, from a total banking perspective,
9   if I see two or more transactions -- getting to the
10   structuring, if I see transactions coming in like that,
11   it's indicative of structuring.  That's not to say from
12   the way you explained it that that's perfectly fine, but
13   it does then present and that's where it goes to
14   education about anti-money-laundering that from just
15   strictly the transactional standpoint, that's going to
16   be flagged.
17   Q. Now, in that scenario, sir, what can Life do from your
18   perspective to address this?  Should they not fundraise
19   at all --
20   A. Absolutely not.
21   Q. -- to not flag it?  What would you recommend in that
22   context to help the organization like Life?
23   A. In that particular context?
24   Q. Yes.
25   A. If I were Life?

15 (Pages 54 to 57)

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

1  Q. Yes.
2  A. I would go to the bank while I have this relationship
3     going on to explain to them the nature of my business
4     and the fact that I'm going to be making these types of
5     deposits in the account, and I understand that they give
6     the appearance of structuring, but this is our normal
7     course of action. If you came in and explained, and
8     especially what was explained yesterday, how these
9     deposits are intended, that we're going to come in and
10    we're going to have multiple individuals coming into one
11    branch or to multiple branches and there's 5,000 here
12    that's going to this cause, there's 5,000 here going to
13    this cause, and this and this, but we're all going to
14    deposit them at the same time in the same bank, we
15    understand we're going to get flagged for structuring.
16    That's automatically going to come up on transaction
17    monitoring.
18           If you go in beforehand and you were to say
19    that, that demonstrates that, you know what? This is
20    reasonable in the context of the type of business I'm
21    running. That's reasonable. Even though there's an
22    appearance of structuring -- even though there's an
23    apparent structuring here, that's a reasonable
24    transactional activity, reasonable for the type of
25    business that you're involved in.

1  Q. What if that was done? You had two fundraisers.
2     They're in the same line. They tell the teller this.
3     What if they did do that?
4  A. Who were they telling, the teller?
5  Q. Yes. They did exactly what you recommended. What if
6     they did do that?
7  A. In a perfect world it would work and the teller would
8     report that. The problem here is that transaction
9     monitoring is still going to flag those transactions.
10    Has it gotten to the business relations people? Who is
11    the relationship manager? Has it gotten there? Then
12    the relationship manager needs to talk to compliance
13    because that's where that flag is going to come from.
14 Q. There was a recent verdict against an Arab bank,
15    correct?
16 A. Yes.
17 Q. Were you involved in that? You made some comments,
18    right?
19 A. I was not involved in the case. I was involved with
20    Arab Bank going back to my Bureau days. I certainly
21    have commented about that case.
22 Q. Was that tried in absentia, the verdict in New York
23    against Arab Bank?
24 A. I'm not sure if it was in absentia.
25 Q. Do you recall making the comment that the bank should

1     get to know its customer?
2  A. I don't recall that specifically, but I probably said
3     that.
4  Q. Do you agree with me that under the new bank -- under
5     the Bank Secrecy Act regulations, that customer
6     identification is important?
7  A. Yes.
8  Q. That banks should delve deeper and look into the
9     identity of its customers?
10 A. Yes.
11 Q. And that would involve bank inquiry, bank contact with
12    the customer?
13 A. Yes and no.
14 Q. What's the yes and what's the no?
15 A. Yes, I agree that from the standpoint of knowing your
16    customer, customer due diligence, it's prudent to get as
17    much information as you can. Certainly when you look at
18    the banks -- and this is where the "no" starts to factor
19    in, but I'm still on the "yes" side. You've got a lot
20    of different stove pipes or silos, and banks are
21    incredibly siloed. You've got the business -- well,
22    let's start with the two major silos; business,
23    compliance. Business, compliance. Now, within those
24    two silos there are additional silos.
25           Go back to the business, you've got the

1     relationship manager. Now, they should be collecting a
2     lot of that information. They should be working in
3     tandem with the compliance people on the due diligence
4     of understanding who the client is and again developing
5     a snapshot what's reasonable for that type of business.
6           When you get to the level of the
7     anti-money-laundering compliance part, if alerts are
8     triggered and an investigation is open, it's pretty much
9     an industry-wide standard that the AML investigator is
10    not going to contact anybody at a bank -- I'm sorry, at
11    a business regarding the account situation. They're
12    going to conduct their own investigation based on what
13    information they've got, and particularly on the
14    transactional information, and they're going to make a
15    determination of whether or not activity in that account
16    is suspicious.
17 Q. You read Ms. Digsby's deposition, right?
18 A. Yes.
19 Q. Did you see part of her testimony where she says that
20    when she did work at the AML unit that at times she did
21    contact the customer to question about a transaction?
22 A. Okay.
23 Q. Do you remember that?
24 A. Not specifically, but okay.
25 Q. Couldn't she have done that here?

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 62

1   A. Could she have? Yes.
2   Q. And had she known that, "Okay. Now I understand the
3      situation here," we may not be here today, right?
4         MR. RODES: Objection; calls for speculation,
5      lacks personal knowledge.
6   Q. (By Mr. Akeel): It's possible?
7   A. It's possible.
8         MR. RODES: Objection; anything's possible.
9         MR. AKEEL: There are some things that are
10     not possible, but we won't get into that.
11  Q. (By Mr. Akeel): I want to go to -- we talked about
12     first base, collecting the cash at the mosque. The
13     controls are there. There is a form of control --
14     anti-money-laundering control there; at least you have
15     three people because that can help.
16         Then we go to the second phase and that's
17     putting the money in the bank account. Again, based on
18     the mission of the charity and the internal controls to
19     segregate the funds to reach its intended destination
20     pursuant to donor intent, they present two deposit
21     tickets at the same bank. Other than what you said,
22     trying to explain to the teller of what's going on, is
23     there anything else that you can see here as you sit
24     here today that Life could have implemented or could
25     implement today to avoid this concern?

Page 63

1   A. Well, I believe I said it before is talk to the
2      relationship manager. This is the reasonable activity
3      we've got, and perhaps even at the branch, if you're
4      going to do business at a branch level and you know
5      you're going to use the same branches, speak to the
6      branch managers.
7   Q. I understand. You know how Life engages in fundraising
8      nationally?
9   A. Right.
10  Q. And you understand one of the reasons why Bank of
11     America was chosen is because it has branches nationwide
12     for purposes of not -- for purposes to be able to
13     deposit the money immediately and not have the
14     fundraiser carry cash on the plane? You understand
15     that?
16  A. Yes.
17  Q. So back to this anti-money-laundering control at the
18     second base where we're in the bank, what else, other
19     than already have spoken to the relationship manager,
20     explaining to the teller, is there anything else that
21     you can share with us?
22  A. No.
23  Q. So as we sit here today, what more can Life do, Life For
24     Relief & Development do, with respect to cash that it
25     collects when it fundraises other than what -- the

Page 64

1      controls that it has already in place?
2   A. Possibly to have a two-step process when you deposit the
3      funds. I get the segregation where you've got the three
4      people checking. You've earmarked the money. Basically
5      the reason you have multiple people making the deposits
6      is because this money is going to A, this money is going
7      to B, this money is going to C. Have one person make
8      the multiple deposits and explain that.
9   Q. Now, are you aware of any other organization that has a
10     situation that Life has right now?
11        MR. RODES: Vague.
12  Q. (By Mr. Akeel): With respect to collecting cash, like
13     churches or synagogues or things of that nature?
14  A. Specifically, no.
15  Q. Have you ever recommended any internal controls to deter
16     money-laundering activity to organizations like Life?
17  A. I would say no.
18  Q. Part of the money-laundering program you had addressed
19     sources. We -- strike that. One more thing regarding
20     the cash. Other than the fundraising activity at the
21     local mosques, did you, in viewing this case for Life,
22     with respect to the sources now, did you see anything
23     else that reflected there were inadequate
24     money-laundering controls other than the scenario that
25     we were talking about in the mosque? Is there anywhere

Page 65

1      else where you saw cash was being collected somewhere by
2      Life and money-laundering controls were not in place?
3   A. No.
4   Q. Let's go to the uses. My understanding is that you said
5      there's procedures also with respect to the uses,
6      correct?
7   A. Yes.
8   Q. Did you hear Mr. Kaszubski say yesterday that one of
9      their controls is that when money is sent for a specific
10     humanitarian project he implemented a program where
11     there would be a reporting program where all the funds
12     have to be accounted for in the report? Did you hear
13     that?
14  A. Yes.
15  Q. Is that a form of an anti-money-laundering control?
16  A. I think that's an accounting control, because again, you
17     have it separated out. On a transactional level, no.
18     On a transactional level, the bank is going to see the
19     transactions. They're not going to see his control.
20     They're not going to see the controls or the accounting
21     at the company level. Again, the bank is down here at a
22     transactional level. They see it differently.
23  Q. Let me ask it another way. What control can Life
24     implement that it doesn't have already with respect to
25     the uses part that you would recommend to deter

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 66

1   money-laundering activity?
2   A. Best case scenario would be to have all the banking in
3       one bank.
4   Q. Let's say they have the banking all in one bank.  Would
5       that increase your comfort that Life has implemented the
6       necessary anti-money-laundering controls with respect to
7       the uses?
8   A. Possibly.
9   Q. Now, were you aware that Life For Relief & Development
10      was trying to open up all of its accounts with Bank of
11      America?
12  A. Not until I read Mr. Alomari's deposition.
13  Q. Were you aware they were trying to communicate with Bank
14      of America to do all the wiring through Bank of America?
15  A. No.
16  Q. You were not aware of that?
17  A. No, not until I read that deposition.
18  Q. It puts things in different context, doesn't it, now
19      that you've read his deposition about Life's intention
20      that they were trying to have Bank of America as the
21      primary bank, or it doesn't?
22  A. It does, but then it begs the question about due
23      diligence.
24  Q. Can you please explain?  What do you mean, due
25      diligence?

Page 67

1   A. The bank is responsible to do due diligence on its
2       customers, to know their customers.  We spoke a little
3       bit about know your customer.  If the bank is
4       restricting the customer in terms of wires or other
5       account relationships, I would think that there are
6       other reasons for that.
7   Q. Do you know why?
8   A. No, I have no idea.
9   Q. One of the reasons you cite in your report is that Life
10      has multiple accounts.  It's a negative thing, right?
11  A. Right.
12  Q. But Life has been trying to put all of its accounts with
13      one bank?
14  A. Yes.
15  Q. In looking at the uses for adequate controls with
16      respect to the anti-money-laundering program, my
17      understanding is if everything is in one bank account,
18      that's a control, correct?
19  A. Yes.
20  Q. Anything else that Life can do --
21  A. Well --
22  Q. -- that they don't do?  Anything that Life can do that
23      they have not implemented already?
24  A. One thing that -- going back to the multiple banks,
25      okay?  Let's go back to that example for a minute.  If I

Page 68

1   were Life and I had the multiple bank accounts like
2   that, we've already discussed the fact that that creates
3   higher risks for other banks because each bank only sees
4   that portion of the activity is what comes and flows
5   through their bank.  If I'm Life and if I want to be
6   transparent, I provide the other banks, or in this case
7   Bank of America, with bank statements on a regular basis
8   from those banks because Bank of America doesn't have
9   access to the transactional activities in the other
10  banks.
11  Q. Wouldn't that go into the relationship-building, knowing
12      your customer, where the manager of Bank of America
13      talks with Life and says, "Hey, we want to make sure we
14      see the big picture.  Can you send us the statements?"
15      Couldn't that be fostered through the relationship?
16  A. It could be.
17  Q. Are you aware of the fiduciary obligations for the board
18      of directors, the officers at a charitable organization,
19      that they basically have to -- that there's a tremendous
20      liability if they don't fulfill the donor's intent to
21      have the money distributed to its intended destination?
22      Are you aware of that?
23  A. Not specifically, but I would assume that there was some
24      sort of responsibility on the part of the board.
25  Q. Do you know what --

Page 69

1   A. Yes.
2   Q. Do you know what the definition of fiduciary
3       responsibility is?
4   A. Yes.
5   Q. What do you think it is?
6   A. I think it's the responsibility of the board to ensure
7       that monies would go to the intended purposes, that
8       depending -- well, speaking in the example of Life, that
9       monies go to their intended purposes, that the
10      charitable operations are performed in the manner
11      they're supposed to be, that they're intended to be,
12      that they protect the assets from fraud and other
13      problems.  Again, to ensure the integrity of their
14      organization by their operations.
15  Q. Did you hear Mr. Kaszubski testify yesterday that for
16      the purpose of continuity of business?  Did you remember
17      hearing him saying that?
18  A. Yes.
19  Q. Where they needed -- where Life, in their exercise of
20      their fiduciary responsibility to ensure the continuity
21      of business, they needed to have different bank
22      accounts?  In the event one bank account closes, they
23      have another so they can use that bank to distribute
24      money to alleviate human suffering?  Did you get that
25      concept yesterday?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 70

1  A. Yes.
2  Q. Knowing that, that that's their reason why Life For
3     Relief had to have more than one account, they had to
4     have a Plan B option in the event the first bank account
5     is closed, do you view that as suspicious or an exercise
6     of the board -- or an exercise of their fiduciary
7     responsibility?
8  A. No, I don't view that as suspicious. I wouldn't have
9     viewed the multiple bank accounts as suspicious. I
10    would have viewed it as being a high risk -- or higher
11    risk. The reality is regardless of the circumstances
12    it's still a higher risk from the bank perspective.
13 Q. But you have provided a solution that it would reduce
14    that high risk to a tolerable level by the bank getting
15    bank statements from other banks, correct?
16 A. Yes.
17 Q. Did you ever make that recommendation to Bank of America
18    or it's just based on what we discussed today?
19 A. No.
20 Q. Let me give you that scenario. If Life For Relief &
21    Development is willing to put all its banking activity
22    with Bank of America, or Life For Relief & Development
23    is willing to provide monthly bank statements of any
24    other bank account it has to Bank of America, that's the
25    first hypothetical. The second is they have the

Page 71

1     controls in place as we described regarding the
2     fundraising activities, they have three people, they
3     count it, they take it and it's known the reason why the
4     deposits are segregated is for a charity mission. We
5     have those two scenarios. So far so good?
6  A. Yes.
7  Q. Based on that hypothetical that I just described, would
8     you be more comfortable to make a recommendation to Bank
9     of America that it can open the bank account with Bank
10    of America because the risk is now within a tolerable
11    limit to deter -- to detect anti-money-laundering
12    activity?
13 A. That would be contingent on other risk factors, but it
14    would elevate my comfort level.
15 Q. What other risk factors that you can share with us?
16 A. Certainly the geographic risk. That's again an inherent
17    risk that's problematic. You've demonstrated you're
18    putting controls together that would help mitigate that,
19    but you still have to overcome that risk.
20 Q. That's one risk, the geographic, which most NGOs face,
21    right?
22 A. Right.
23 Q. And many NGOs bank with major banks, correct?
24 A. Right.
25 Q. Many banks recognize that inherent risk where they're

Page 72

1     providing humanitarian aid in areas of strife, right?
2  A. Yes.
3  Q. Any other risk?
4  A. Yeah, the type of accounts. You're dealing with main
5     charitable accounting. You're dealing with operating
6     accounts. How many operating accounts are you dealing
7     with? If you look at what Bank of America looked at
8     here, you're looking at a secondary or a nominal account
9     with nominal activity. And again, just based on that
10    transactional activity, now it's not consistent with a
11    charity's operating account, so what's the
12    reasonableness of that type of account?
13 Q. In your report you mention that you had an opportunity
14    to review the analysis of the transactions that took
15    place in that bank account, correct?
16 A. Yes.
17 Q. And it appeared to be all related to the charity,
18    correct?
19 A. Yes.
20 Q. So again, just like the issue with what more controls
21    can be in place for the anti-money-laundering, when we
22    talked about the fundraising, what more can Life do at
23    this time to increase your comfort to make the
24    recommendation to have its bank accounts open?
25 A. I'm a bit flattered that you think I have that --

Page 73

1  Q. I'm going to based on your opinion that considerations
2     to open -- see, this case is a little different. This
3     case is not about money damages, as you know. Obviously
4     we have money with attorneys and all this, but there's a
5     difference here. It's almost like we have -- obviously
6     they've suffered in their reputation and all that. You
7     understand there's different motivations here.
8        One of the things that's being addressed
9     and is even being addressed by the judge is why can't
10    the bank account be open? One of the issues is, well,
11    maybe there is discrimination because Life's doing
12    everything it can. So I'm trying to get to a situation
13    of what else -- if Life agrees to put all its bank --
14    let me go back.
15       If it's now been determined that all the
16    transactions in that bank statement are charity-related,
17    okay? If it's been determined that the deposits were
18    made for noble purposes, for proper internal control
19    purposes, if it's been established that Life has the
20    proper controls when it's collecting cash, at least at
21    the door, and if Life agrees to combine all its bank
22    accounts in one or provide bank statements, what else
23    can Life do to make it now a tolerable risk for a bank
24    account to be open at Bank of America?
25       MR. RODES: Asked and answered.

19 (Pages 70 to 73)

Dennis Lormel
12/16/2014

Page 74

1    THE WITNESS: Other than what we've
2  discussed --
3  Q. (By Mr. Akeel): Nothing else?
4  A. No.
5  Q. I'd like to go over your report. In your report, which
6    we've identified, sir, as Exhibit 1, if we can go,
7    please, to page five, you state, "With respect to the
8    actions taken by Ms. Marshall and Ms. Digsby,
9    respectively, based on the account activity, they both
10   acted in a reasonable and responsible manner in
11   accordance with industry AML standards. Ms. Marshall
12   diligently followed up on her contact with an FBI agent,
13   took appropriate investigative steps and identified
14   account transactional activity that was not consistent
15   with the expected activity of charity." Do you see
16   that?
17 A. Yes.
18 Q. You agree with me that in light of the information that
19   you have now with respect to the transactional activity,
20   that it was consistent and an expected activity of a
21   charity?
22 A. Qualifier on that. Again, that activity in that account
23   was certainly -- in looking at the accounts that I
24   looked at or the transactional information that I had
25   the opportunity to look at, yes. However, again, when

Page 75

1    you compare that account the way it was then, when you
2    look at other charity accounts, that wasn't reasonable.
3  Q. I'm just focusing on that statement where it says,
4    "Identified transactional activity that was not
5    consistent with the expected activity of a charity."
6    When you were provided Bates Life 269 to 270, the
7    spreadsheet listed the expenses and were, in fact,
8    consistent with the charity activity, correct?
9  A. They were consistent with that account's activity, but
10   not with what you would normally expect in a charity.
11   That's what I'm trying to say.
12 Q. You don't think a charity needs to expend or
13   write checks for plane tickets or for office supplies?
14 A. I think they should, yeah.
15 Q. You understand that's the kind of expenses that were at
16   the Bank of America account?
17 A. Right. But again, when you look at an account that's
18   going to be an operating account like that, that was
19   really nominal expenses and things. You would expect a
20   lot more activity.
21 Q. Maybe you would expect also, as part of the Bank Secrecy
22   Act, a phone call, "Hey, you guys in the website say
23   you're dealing in millions. We just see 100,000.
24   What's going on?" right?
25 A. Well, again, it depends on who the phone call is

Page 76

1    supposed to come from.
2  Q. Someone from the bank.
3  A. There's no requirement in the Bank Secrecy Act for that.
4  Q. Let's go to the next thing here. "This included
5    identifying unusual pattern of deposits, including two
6    instances of structuring." Do you see that?
7  A. Yes.
8  Q. Where did you get that information that they detected
9    structuring when they were going to close the bank
10   account?
11 A. It was all in Ms. Marshall's deposition, and when I
12   looked at the account activity myself you could see that
13   pattern of activity.
14       MR. AKEEL: I would like to mark this as
15   Exhibit 4.
16       (Whereupon Deposition Exhibit No. 4
17       was marked for identification.)
18 Q. (By Mr. Akeel): I've given you, sir, what's been marked
19   as Exhibit 4. Exhibit 4 is titled, "Global AML 30-Day
20   Closure Recommendation." Was that report provided to
21   you?
22 A. Yes.
23       MR. RODES: Objection. There's three
24   versions of the page we're looking at, Bates 36.
25   They've been produced in discovery.

Page 77

1        MR. AKEEL: Well, I have --
2        MR. RODES: Okay. You have it there.
3  My apologies.
4        MR. AKEEL: I put not version two. What's
5  the point?
6        MR. RODES: I'm sorry, I didn't realize you
7  attached the same version three. You're good to go.
8  Appreciate it.
9        MR. AKEEL: For the sake of clarity on the
10 record, Exhibit 4 is Bates 36 version three; 37, version
11 two; 38, 39.
12 Q. (By Mr. Akeel): Was this furnished to you for your
13   review before you issued your opinion?
14 A. Yes.
15 Q. Have you seen this kind of a report before?
16 A. Yes.
17 Q. What is it?
18 A. It's basically a recommendation to close the account.
19 Q. Have you had to give an opinion regarding this report on
20   other cases?
21 A. I'm sorry, can you repeat that?
22 Q. Have you had to give another opinion in another case
23   regarding the improper closure of an account and you
24   looked at some kind of closure report like this?
25 A. No, not in any other case.

20 (Pages 74 to 77)

Dennis Lormel
12/16/2014

Page 78

1    Q. If you can please go down to the middle where it says,
2       "Global AML has based its closure recommendation on the
3       following factors. The factors listed below are NOT,"
4       capital "not" and underlined, "to be communicated to
5       customer(s)/client(s) under any circumstance. The
6       purpose of providing this information is to assist the
7       line of business in identifying potential or continued
8       policy/procedure violation, address these in a timely
9       fashion and contribute to the closure decision." Do you
10     see that?
11    A. Yes.
12    Q. Do you see the first box?
13    A. Yes.
14    Q. Can you please read that for the record?
15    A. "Accounts/entities exhibiting patterns of structured
16       transactions."
17    Q. Was that marked?
18    A. No.
19    Q. In fact, if you can look at this report, Exhibit 4, is
20       there any reference, sir, that Ms. Digsby or
21       Ms. Marshall had stated, "Hey, there's a pattern of
22       structuring here, and here are the two dates where we
23       discovered that to justify our closure"?
24    A. No.
25    Q. So you agree with me that when we go back to your

Page 79

1       report, which is page five, which states, "This included
2       identifying unusual pattern of deposits, including two
3       instances of structuring," you're really referring to
4       what she testified to and not what she put in her
5       closure report at the time when they made the decision
6       to close the account, correct?
7    A. No, I'm talking about both. In here she talked about a
8       pattern of activity. Structuring is a pattern of
9       activity.
10    Q. Where do you see, sir, the word "structured"?
11    A. I see "structured" in that box you pointed out.
12    Q. I understand that, but is it marked?
13    A. No.
14    Q. Did you listen -- or did you read Ms. Digsby's
15       deposition?
16    A. You mean Ms. Marshall?
17    Q. No, Ms. Digsby.
18    A. Yes.
19    Q. Did you read her testimony where she said she doesn't
20       see any reference to any structure in the report as
21       well?
22    A. Yes.
23    Q. So back to your report here where you say, "This
24       included identifying unusual pattern of deposits,
25       including two instances of structuring," my point is, if

Page 80

1       you just look at Exhibit 4, is there any reference to
2       structuring in two instances?
3    A. No.
4    Q. Let's continue. If we can go, please, to the next thing
5       here.
6    A. Where are you?
7    Q. We're still in your report, page five. "Ms. Marshall
8       also identified a pattern of transactional activity that
9       was conducive to personal expenditure versus business
10     expenses consistent with the account of a charity." Do
11     you see that?
12    A. Where are you again? Oh, yes, yes, yes.
13    Q. Do you agree with me based on what we've discussed today
14     that there's no evidence that there were personal
15     expenses?
16    A. Based on our discussion here, yes.
17    Q. If we can continue to the next -- page six, please. In
18     the beginning of the paragraph you stated, "Patterns of
19     deposit activity into the LFRD account from unknown
20     sources in numerous states in the U.S. to include
21     instances of structuring is consistent with the
22     placement of funds in the front end of money-laundering
23     process and therefore it was reasonable for Ms. Marshall
24     to flag instances she reviewed as suspicious." Do you
25     see that?

Page 81

1    A. Yes.
2       MR. RODES: Where are you on the page?
3       THE WITNESS: This part right here.
4       MR. RODES: Okay.
5    Q. (By Mr. Akeel): We kind of addressed some of the things
6       in here, but the first sentence I'd like to look at
7       where it says, "Patterns of deposit activity into the
8       LFRD account from unknown sources." Where did you get
9       the words "unknown sources" from?
10    A. That was Ms. Marshall's depo.
11    Q. That's from her deposition?
12    A. Yes.
13    Q. If we can please go to the closure report, page two, do
14       you see on the bottom it says, "Investigation Results,
15       High Level"?
16    A. Yes.
17    Q. It says, "An investigation of the account in the name of
18       Life For Relief & Development revealed unknown sources
19       of cash deposits." Do you see that?
20    A. Yes.
21    Q. Did you come to learn what she was referring to when she
22       was saying that the deposits were from unknown sources?
23       Did you understand my question?
24    A. I thought you were going to say something else.
25    Q. No. I said, did you come to learn what Ms. Marshall was

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 82

1    referring to when she was saying the deposits were from
2    unknown sources?
3    A. Yes.
4    Q. What did you learn?
5    A. From the bank tickets, that there's no name of somebody
6        depositing -- it's counterdeposits.
7            MR. AKEEL: I would like to mark this as
8    Exhibit 5.
9            (Whereupon Deposition Exhibit No. 5
10       was marked for identification.)
11   Q. (By Mr. Akeel): I've given you, sir, what's been marked
12       as Exhibit 5. Have you seen this before?
13   A. Yes.
14   Q. Now, can you please identify this for the record?
15   A. These are out-of-state counterdeposits, a series of
16       them, that correlate to the amounts that Ms. Marshall is
17       talking about for the unknown deposits.
18   Q. Have you seen this type of credit -- I mean this type of
19       deposit slip before where a customer is supposed to
20       complete it and then give it to the teller?
21   A. Yes.
22   Q. Do you see on the top, for example, the first one in
23       Exhibit 5, it's Bates 120?
24   A. Yes.
25   Q. It looks like someone handwrote the amount of the

Page 83

1    deposits, cash of 540. Do you see that?
2    A. Yes.
3    Q. Can you please explain to me where can a depositor put
4        his name so he can be identified?
5    A. There isn't anyplace on the form for that.
6    Q. In fact, isn't this a common slip that is used by
7        customers in general to deposit?
8    A. Yes.
9    Q. So isn't it true that basically when a customer submits
10       this type of deposit that we're looking at, if all
11       customers are using this deposit slip that we're talking
12       about that they're all unknown and unidentified,
13       correct?
14   A. Yes.
15   Q. If all the customers are unknown and are unidentified
16       when they're making deposits, what makes it unusual for
17       Life in comparison to another customer that's also
18       making a deposit from unknown sources and the depositor
19       is unidentified, if you know?
20   A. In this instance you have a pattern. It's not just one
21       person. There's a number of deposits coming, as she
22       said, from different places in the country. That's
23       indicative of different types of money-laundering
24       patterns.
25   Q. Where can a customer put his name to negate this

Page 84

1    inference so this presumption doesn't stand out that
2    they're engaging in money-laundering?
3    A. It's not on the form.
4    Q. Would you agree with me, sir, that if Bank of America
5        had a place on its form for a customer to put his name
6        or her name that that can alleviate that confusion?
7    A. Yes, but that's also -- it's not just Bank of America.
8    Q. I'm just saying --
9    A. Yes.
10   Q. Would you agree with me that that -- in fact, that could
11       also be an enhancement of money-laundering control and
12       that the bank is being more prudent and responsible that
13       if they had a place in the deposit slip where a
14       depositor can identify his name or her name and address,
15       that that can increase internal controls to deter
16       money-laundering?
17   A. Only if you can verify the names.
18   Q. I understand, sir, but isn't it better than not having a
19       name?
20   A. Yes.
21   Q. And when you have the name, that can help further deter
22       the money-laundering activity?
23   A. Yes.
24           MR. AKEEL: We can break at this time.
25           (Break in proceedings.)

Page 85

1            MR. AKEEL: Sir, we're back on the record.
2    You understand you're still under oath?
3            THE WITNESS: Yes.
4    Q. (By Mr. Akeel): We were going over your report. When
5        we left off we were on page five. I'd like to take you
6        to page 11, please. I'm sorry, page 12. In the middle
7        of the paragraph you state, "Based on the review of
8        account transactional information, Ms. Marshall
9        determined that the transactional activity of the
10       combined accounts was not consistent with the
11       transaction activity for a charity. She also determined
12       that the pattern of cash deposits made in multiple
13       states to include two instances where deposits were
14       structured were unusual." Do you see that?
15   A. Yes.
16   Q. We already went over that?
17   A. Yes.
18   Q. This is the part I want to discuss. "Further,
19       Ms. Marshall determined that expenses from the account
20       appeared to be personal instead of business-related."
21       We've already discussed that, right?
22   A. Yes.
23   Q. "When asked by LFRD's Counsel during deposition,
24       Ms. Marshall advised she was concerned about a check
25       deposited into BoA account 7217 on December 30, 2012 in

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 86

1    the amount of $100,000. The check came from Zakat
2    Foundation and contained the handwritten reference
3    'EM/Syria.' In addition to the concern about the amount,
4    none of the money was sent to Syria or to any
5    identifiable charitable purpose. Based on my review of
6    the combined BoA account statements for the period March
7    31, 2012 -- 2011 and May 31, 2012 (LFR BANA 60-119) and
8    the deposit slip and check from the Zakat Foundation,"
9    and again it's in paren the Bates number, "I concur with
10   Ms. Marshall's finding." Do you see that?
11   A. Yes.
12   Q. If we can go back to the closure report, which is
13   Exhibit 4, would you agree with me, sir, that there's no
14   indication or no reference at all of a $100,000 deposit
15   concern?
16   A. Yes.
17   Q. And in fact, if we look at the closure report, there's
18   no indication that the $100,000 was ever a concern --
19   the specific $100,000 was a concern to cause the account
20   to be closed; you agree?
21   A. Let me look at something, if I may.
22   Q. Sure.
23       MR. RODES: What was your question, whether
24   or not it was a concern or whether or not that's in
25   the --

Page 87

1        MR. AKEEL: It's in the report.
2        THE WITNESS: Yes, okay. Yes.
3    Q. (By Mr. Akeel) If we can continue, it states in the
4    next paragraph, "The deposit of the check from the Zakat
5    Foundation to BoA account 7217 is an anomaly and a red
6    flag. This deposit was totally inconsistent with other
7    deposits into the BoA account. It would appear that the
8    check from Zakat Foundation was intended to go to
9    charitable purposes, especially with the handwritten
10   reference 'EM/Syria.' I believe the term 'EM/Syria'
11   means earmarked for Syria. The funds sat in the BoA
12   account from December 30, 2011 until at least May 31,
13   2012." Do you see that?
14   A. Yes.
15   Q. You agree that your observation here that you reference
16   in your report is not in the closure report, correct?
17   A. Yes.
18   Q. Now, when you were making this report, sir, were you
19   ever furnished a report that I'm about to give you?
20       MR. AKEEL: I'd like to mark this as
21   Exhibit 6.
22       (Whereupon Deposition Exhibit No. 6
23       was marked for identification.)
24   Q. (By Mr. Akeel) Were you ever furnished this report
25   before you authored your report, which is Life Bates 1

Page 88

1    to Bates 4, and it's titled, "Report for the Emergency
2    Relief for Syrian Refugees in Jordan, January 2012"?
3    A. I believe I did see this.
4    Q. Do you see how the report is dated January 2012?
5    A. Yes.
6    Q. Do you see how the deposit was made the prior month, in
7    December of 2011?
8    A. Yes.
9    Q. Now, do you see on the second page where it says,
10   "Praise for Zakat Foundation," and this is Bates 3? On
11   the bottom it states, "During the distribution, Life
12   staff received many words of praise and thanksgiving for
13   Zakat Foundation and the donors who provided the funds
14   for this project." Do you see that?
15   A. Yes.
16   Q. Now, doesn't it appear, sir, if the deposits were made
17   into the bank account at Bank of America to alleviate
18   human suffering for Syrian refugees in Jordan in
19   December of 2011 and you have a report the following
20   month that it appears that the funds that were deposited
21   in Bank of America reached its intended destination in
22   Jordan, from what I'm showing you?
23   A. Yes. Well, from a banking perspective -- from Bank of
24   America's perspective, all they see is a hundred
25   thousand dollars sitting in a bank account. Regardless

Page 89

1    of whether I see this or not, the $100,000 that was
2    deposited by that entity is still sitting in that bank
3    account. From the singular standpoint of Bank of
4    America, it's hard for them to draw -- or for me to draw
5    the inference that that money -- I mean, from a common
6    sense standpoint, yeah, it looks like this is the
7    benefit of that project. From strictly a transactional
8    standpoint, the $100,000 is sitting where it is. Bank
9    of America has a regulatory issue here.
10   Q. I understand. We already established in the closure
11   report the $100,000 thing isn't even an issue, correct?
12   A. I need to go back and really read this.
13   Q. Sure. Take a moment. Take a look at the closure report
14   and see if there's any concern raised.
15   A. I thought I saw in the closure report she talked about
16   transactional activity on a higher level, which in my
17   view would then include this.
18   Q. All I'm talking about is one thing. Can you see if
19   there's any concern in the closure report that, "Hey, we
20   have the $100,000 and it looks like it's been sitting in
21   the account for several months and it doesn't appear
22   that it reached its intended destination"?
23   A. It doesn't say that, obviously.
24   Q. In the EM/Syria where you say, "I believe the term
25   'EM/Syria' means earmarked for Syria," you're just

23 (Pages 86 to 89)

Dennis Lormel
12/16/2014

Page 90

1    guessing on that, right?
2    A. Yes.
3    Q. You see on the report it says, "Emergency." Couldn't
4       the "EM" say, "Emergency/Syria"?
5    A. Yes.
6    Q. Now, I understand -- are you familiar with debt
7       principles?
8    A. Yes.
9    Q. How did you gain that familiarity?
10   A. I have an accounting degree, Bachelor's in Accounting.
11      I spent three years with the IRS as an IRS auditor.
12      I've done limited accounting work, very limited, so I
13      qualify that. After I retired from the FBI, I went to
14      work with AES, a Fortune 200 energy company, and I was
15      brought in to set up an anti-fraud program, and I did
16      that in the internal audit department, so we obviously
17      were dealing with accounting principles, the same
18      principles he was explaining yesterday.
19   Q. Mr. Kaszubski?
20   A. Yes.
21   Q. I'm not laughing because of what you're saying. It's
22      just my annunciation of the name.
23   A. I got it.
24   Q. Perception is an issue here in this case. Are you aware
25      of accounting principles applied in not-for-profit

Page 91

1    sects?
2    A. Not specifically in general. I understand the
3       accounting principles, right? That's one thing. But
4       also from a transactional standpoint at the bank, the
5       bank has to be concerned about the regulatory
6       responsibility and they have to answer to the
7       regulators. The regulators see the hundred thousand.
8       They don't look at accounting principles.
9    Q. I'm asking you a simple question.
10   A. Yes, I'm sorry.
11   Q. Do you understand the principles where if government
12      accounting is implemented that there could be accounts
13      used known as restricted funds?
14   A. Yes.
15   Q. Have you heard of that?
16   A. Yes, and you spoke about that yesterday.
17   Q. You agree with me that restricted funds means that if
18      the accounting system is set up that way, that if
19      100,000 is to be taken for an intended purpose, that
20      that specific hundred thousand would be put in that
21      account and then it would be used for that restricted
22      purpose? Do you understand that?
23   A. Yes.
24   Q. And do you understand that typically cash is fungible?
25   A. Yes.

Page 92

1    Q. You can put 100,000 for an intended purpose as long as
2       the 100,000 reaches its intended destination. You
3       understand it may not be the same $100,000 in bills?
4    A. Yes.
5    Q. I just want to make sure. If I'm giving $20 to go to an
6       orphan, you understand that same $20 bill may not be the
7       one -- it could be another $20 bill?
8    A. Yes.
9    Q. And you understand that that other $20 bill, if you
10      don't have a restricted fund, could be from another
11      account?
12   A. Yes.
13   Q. Now, in listening to the testimony yesterday, did you
14      hear where it was testified that the big picture is the
15      most important thing and that is you compare the sources
16      with the uses to make sure that the sources are
17      distributed in a manner where it would be consistent
18      with the uses? Do you remember that line of testimony?
19   A. Yes.
20   Q. So if we look here at the Zakat Foundation in the big
21      picture sense and the Zakat Foundation distributed the
22      100,000 -- I'm going past the closure report now. I'm
23      addressing this concern you have in your report. If you
24      look at the 100,000 that was donated by Zakat Foundation
25      and they wanted it -- and it says, "Emergency Syria,

Page 93

1    EM/Syria," and then I show to you Exhibit 6, the report
2    showing that the next month, you agree from a big
3    picture sense that the sources match the use?
4       MR. RODES: Objection; calls for speculation
5    and assumes facts not in evidence.
6       THE WITNESS: In general, yes, but I don't
7    know that the same amount of money went there.
8    Q. (By Mr. Akeel): I understand. Was there any follow-up
9    inquiry made to ascertain whether the money the -- the
10   exact 100,000 went there?
11   A. Not by me, and certainly I don't know to what degree
12      Ms. Marshall followed up.
13   Q. You know, you had mentioned earlier a person by the name
14      Mr. Alamari?
15   A. Yes.
16   Q. What was the relationship to you on this? You
17      represented him?
18   A. No, no, no. Ali Alamari was arrested in 2002, in that
19      time period, and ultimately charged as an enemy
20      combatant. He was sent here the day before 9/11 to be
21      the facilitator of the second wave of terrorist attacks.
22   Q. You know the guy next to me, his name is Mr. Alomari?
23   A. Yes.
24   Q. When you saw his name -- again, I'm trying to go into
25      your state of mind. Did you think maybe there's a

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 94

1  connection?
2  A. Absolutely not.  His spelling is totally different than
3     the other Alamari.
4  Q. Other than the spelling, did you do an investigation or
5     anything?
6  A. I knew Alamari's background.  Not this Mr. Alomari, the
7     Alamari we were dealing with.
8  Q. There is indication of -- if we can go, please, to page
9     13, I'd like to ask you a question.  Do you remember
10    when Mr. Kaszubski testified that what is important is
11    to look at the general ledger?  When you see cash coming
12    in, that the general ledger on the balance sheet would
13    indicate the cash that's on hand at that time.  Do you
14    remember that?
15 A. Yes.
16 Q. Have you seen balance sheets where there is a trial
17    balance?
18 A. Yes.
19 Q. Have you seen balance sheets where you'll have a total
20    sum of cash, but if you go to the trial balance, the
21    trial balance has sub parts that make up the cash
22    balance on the balance sheet?
23 A. Yes.
24 Q. And what does the term "commingling" mean to you?  What
25    does that mean?

Page 95

1  A. Well, commingling of funds on one level would be if you
2     take -- the simplest explanation is when you take licit
3     funds and illicit funds and you're commingling them in
4     the same account.
5  Q. I'm sorry?
6  A. From a law enforcement perspective, if I'm investigating
7     a criminal activity, oftentimes the criminal, to hide
8     the activity and the money, commingles the funds into a
9     legitimate bank account.
10 Q. Is there any other definition you have with the word
11    "commingling"?
12 A. Well, where you're mixing funds together.
13 Q. Have you heard it in a civil context if you are using
14    funds from a business and you're applying it for
15    personal expenses?
16 A. Yes.
17 Q. So based on what we discussed here, there is one sense
18    of commingling -- one definition of commingling where
19    monies -- illegal money is mingled with good money,
20    that's what you mean?
21 A. Yes.
22 Q. And the second commingling is when there's personal
23    expense being commingled with business expense?
24 A. Yes.
25 Q. Is there any other definition of commingling that you're

Page 96

1  aware of?
2  A. No.
3  Q. Let's go, please, to the middle of page 13, under J,
4     where it says, "Best Practices for Accountability and
5     Transparency of a Charity," and then you look at it
6     says, "When LFRD -- what LFRD did was a form of
7     commingling funds were specific funds intended for one
8     purpose are used for a different purpose."  Do you see
9     that?
10 A. Yes.
11 Q. We went over the word "commingling."  We don't have
12    personal expenses being commingled with business
13    expenses, correct?
14 A. Correct.
15 Q. And we don't have illegal monies being commingled with
16    good monies, correct?
17 A. Correct.
18 Q. So the word "commingling" here is not a proper word,
19    correct?
20 A. Correct.
21 Q. If we can, please, go to the next page, page 14 -- I'm
22    sorry, page 15.  If we can go to the third paragraph,
23    "While I was conducting limited due diligence research
24    to support my findings in this report, I identified
25    negative media reporting regarding LFRD.  According to

Page 97

1  media reports, in 2006 the FBI executed a search warrant
2     at LFRD's South Michigan office.  Subsequently, former
3     LFRD employee Muthanna Al-Hanooti was indicted by a
4     Grand Jury in 2008 for illegal activity conducted with
5     Iraq while employed by LFRD."  Do you see that?
6  A. Yes.
7  Q. Is the media that you're relying on the one that we went
8     over, MilitantIslam.org?
9  A. No.
10 Q. Do you have definite knowledge that he was indicted at
11    all while employed with Life other than what you relied
12    on in the media?
13 A. I'm trying to remember if in the indictment it said he
14    was employed by Life.  I read the indictment, but I
15    don't recall off the top of my head.
16 Q. Well, would it surprise you he was not employed by Life
17    and it was after -- after the relationship was
18    terminated with Life?  Would that surprise you, sir, to
19    know that Mr. Hanooti was indicted after he left the
20    employ of Life?
21 A. But for activity while he was at Life.
22 Q. I'm asking you, would it surprise you that Mr. Hanooti
23    was indicted for activities personal to him, not related
24    to Life, and it was after he left Life?
25 A. Search warrants were executed at Life, so there was an

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 98

1    involvement, but under what you just said, yeah, he
2    wasn't at Life at that point.
3    Q.  You understand the difference between a search warrant
4    and an indictment?  Search warrant is an investigative
5    tool, right?
6    A.  Yes.
7    Q.  To gather information?
8    A.  I know it very well.
9    Q.  I don't want to mix the concepts.  The indictment could
10   be for something different than what's in the search
11   warrant or it could be for facts gathered later, right?
12   A.  Yes.
13   Q.  Are you aware that he was indicted for things unrelated
14   to Life and it was after he left Life?
15   A.  Not specifically.
16   Q.  If someone -- have you done white collar crime?
17   A.  Have I committed it?  No.
18   Q.  Have you been involved in investigating white collar
19   crime?
20   A.  Yes.
21   Q.  Have you been involved where employees or former
22   executives worked at a company and then later on they
23   were indicted for something?
24   A.  Yes.
25   Q.  Would you attribute that indictment to the company that

Page 99

1    they used to work for?
2    A.  I would attribute it to the individual, but it could be
3    involving an activity on behalf of the company.
4    Q.  Do you have certainty today that Muthanna Hanooti was
5    indicted and convicted for activities involving Life?
6    A.  No.
7    Q.  Now, do you know what the illegal activity was he was
8    indicted for?
9    A.  I did.  I don't specifically recall right now.
10   Q.  You testified earlier today -- you said the word
11   "terrorism."  It's a commonly used word.
12   A.  Yes.
13   Q.  Do you have definite knowledge that he was indicted for
14   terrorism?
15   A.  No.
16   Q.  Are you aware of the facts surrounding where he was
17   accused for having congressmen -- United States
18   congressmen go to Iraq to see the suffering and that was
19   the issue regarding how the congressmen were flown over
20   to Iraq to see the human suffering?  Are you privy to
21   those facts?
22   A.  Yes, I saw that.
23   Q.  If we can, please, go to page 16, in the fourth
24   paragraph, sir, where it says, "The fragmented nature of
25   LFRD's bank accounts, do you see that?

Page 100

1    A.  Yes.
2    Q.  When you use the word "fragmented," do you mean using
3    more than one bank account?
4    A.  Yes.
5    Q.  Based on what we discussed today, you understand why
6    there was more than one bank account?  It was for a
7    matter of survival?
8    A.  Yes.
9    Q.  If we can continue, it says here, "The fragmented nature
10   of LFRD's bank accounts and the singular nature of the
11   accounts at BoA poses a high level of risk at BoA.  The
12   risk is compounded by the nominal nature of the BoA
13   accounts and the fact is not consistent with activities
14   conducted by charities."  Do you see that, and you have
15   a plural in charities?
16   A.  Yes.
17   Q.  You haven't examined the bank accounts of other
18   charities, correct?
19   A.  Correct.
20   Q.  So it's really hard for you to make a comparison with
21   Life with other charities at this time, correct?
22   A.  Yes.
23   Q.  If we can please go to the last page, we went over this.
24   Again, I'm going to ask you now, in light of what we
25   discussed today regarding the testimony and what we've

Page 101

1    established, if we can look at that last page, that last
2    sentence again where it says, "I reserve the right to
3    modify this report upon further review or any new
4    information that comes to my attention," do you see
5    that?
6    A.  Yes.
7    Q.  Would you agree with me, sir, that based on what we
8    discussed today, that this report could be modified and
9    changed to be more accurate?
10   A.  In certain respects, yes.
11   Q.  My understanding is that you were part of a thing called
12   "Counterterrorism Blog"?
13   A.  Yes.
14   Q.  And that has ceased, correct?
15   A.  Yes.
16   Q.  When did that stop?
17   A.  Somewhere around 2008, 2009.
18   Q.  Why?  What happened to stop that?
19   A.  The person who was really the individual behind it who
20   kind of operated the blog, his job changed and he didn't
21   have the time and nobody really had the time to
22   administer it.
23   Q.  And what was this person's name?
24   A.  Andrew Cochran.
25   Q.  Do you know him personally?

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 102

1　A. Yes.
2　Q. And what's his background?
3　A. I met him -- he was a congressional staffer on the
4　　House -- I think it was the House Financial Services
5　　Committee.
6　Q. Now, regarding this blog, did you meet with other
7　　contributing authors face-to-face?
8　A. On occasion.
9　Q. And who were the authors that you remember meeting?
10　A. Victor Comras.
11　Q. Can you spell that, please?
12　A. C-o-m-r-a-s.
13　Q. Okay.
14　A. Andy wrote a bit, Andy Cochran, Doug Farah.
15　Q. Doug Farah?
16　A. Yeah. He's a former reporter for the Washington Post
17　　and he actually went to one of those think tanks I
18　　talked about. I'm terrible with names. Jonathan Winer,
19　　W-i-n-e-r. There were a lot of people on there.
20　Q. Steve Emerson?
21　A. Emerson was on there, but Emerson didn't really write.
22　　He had other folks do his writing for the most part.
23　Q. Bill West?
24　A. Yes.
25　Q. What's his background?

Page 103

1　A. If I'm not mistaken, there were two Bills. Bill West I
2　　believe was with the State Department.
3　Q. So you met with him personally, too?
4　A. Yes.
5　Q. How about Evan Coleman?
6　A. I know who he is. We never met.
7　Q. Who is he?
8　A. He's a terrorism -- he's a talking head, basically.
9　　He's a terrorism expert, works at one of the think
10　　tanks.
11　Q. Which think tank?
12　A. I'm not sure.
13　Q. Michael Kraft?
14　A. Yes.
15　Q. What his background?
16　A. He's a former immigration customs agent.
17　Q. Dr. Zachary Abuza?
18　A. Yeah, he was from the Middle East somewhere. He might
19　　have been a professor, I believe, somewhere. He was,
20　　again, another person in the think tanks.
21　Q. Dr. Walid Faris?
22　A. Yes.
23　Q. Who is he?
24　A. He's an author. Again, somebody I believe in the think
25　　tanks. Does an awful lot of writing on the Middle East.

Page 104

1　Q. So all these people you met with?
2　A. Not on a regular basis. For instance, we would get a
3　　group of us. At times we would do congressional
4　　briefings.
5　Q. What was the purpose of this counterterrorism blog?
6　A. It was to promote awareness to terrorism. My
7　　involvement in it was to promote awareness to terrorist
8　　finance and issues, things like that.
9　Q. What is your definition of a terrorism expert?
10　A. That's a good question. I think you can have varied
11　　views on that. Certainly somebody who's had firsthand
12　　experience in dealing with terrorism. Some of these
13　　folks from their -- I think more from an academic
14　　standpoint consider themselves experts.
15　Q. How about Daveed Gartenstein-Ross; do you know him?
16　A. Yes.
17　Q. Who is he?
18　A. Daveed worked at an NGO, the one up in Oregon, that you
19　　had the case against Pete Setta (ph). I don't recall,
20　　again, the name -- I should know the name of the charity
21　　off the top of my head. The charity was convicted and
22　　ultimately I think the conviction was set aside on a
23　　technicality.
24　Q. He wrote a book, something about Jihad or something
25　　about Islam?

Page 105

1　A. It was about his conversion to Islam.
2　Q. He converted to Islam?
3　A. Yes.
4　Q. It's about his conversion?
5　A. It's about his transformation, how he converted. Like I
6　　said, there was an NGO up in Oregon and Pete Setta ran
7　　the NGO.
8　Q. Paraterian (ph)?
9　A. No.
10　Q. You know which NGO I'm talking about, Paraterian?
11　A. That's not it, though. I don't know them, but that's
12　　definitely not the NGO. In any event, Gartenstein wrote
13　　a book about how he evolved and how he converted to
14　　Islam and how he was influenced by Setta and others.
15　Q. Is he considered an extremist now or a danger?
16　A. No.
17　Q. Olivia --
18　A. Go back to Gartenstein for a minute. He's another guy
19　　who's in the think tank. He's more of an academic type,
20　　but he's got the experience of having worked in an NGO
21　　and his book is about his personal experience of what he
22　　went through, and he's mild.
23　Q. How about Olivia Gateau?
24　A. I've met her. She's in a think tank. I don't really
25　　know her very well. One of those policy institutes.

27  (Pages 102 to 105)

Dennis Lormel
12/16/2014

Page 106

1  Q. How about Kenneth Conaboy?
2  A. I've never met him. I've certainly read some of his
3     stuff. I'm not sure if he was a reporter or not. I
4     don't know what his background really was.
5  Q. Aaron Manns?
6  A. Yeah.
7  Q. Who's he?
8  A. He was a professor at Maryland University.
9  Q. What's his background?
10 A. Other than being a professor, I'm not sure.
11 Q. How about David Shanker?
12 A. I don't believe I knew him. The name is familiar, but I
13    don't believe I knew him.
14 Q. How about Arnish Roul?
15 A. I don't know much about him.
16 Q. What's his background, do you know?
17 A. No.
18 Q. Matthew Levitt?
19 A. Matt Levitt, former FBI analyst. He's now at Washington
20    Institute for Near East Policy. He's one of the people
21    who writes extensively about Hezbollah and Hamas.
22 Q. How about Jonathan Winer?
23 A. I gave you his name. He was a former State Department
24    official, former Treasury official.
25 Q. How about Frank Highland?

Page 107

1  A. No, I don't think I know Frank.
2  Q. Roderick Jones?
3  A. No, I don't know him.
4  Q. Paul Cruick, C-r-u-i-c-k?
5  A. No. As this blog -- as it was followed extensively,
6     more people got involved.
7  Q. Farhana Qazi?
8  A. No, I don't recall that name.
9  Q. Lorenzo Vidino?
10 A. Yes.
11 Q. Who's he?
12 A. He had worked at Emerson's Investigate Project.
13 Q. Steve Emerson?
14 A. Yeah, and he left and went to Europe, I believe, to
15    Italy. He wrote a book over there. He's a very
16    grounded guy, very objective.
17 Q. How about Madeline Gruen?
18 A. I don't believe I've ever met her.
19 Q. How about James McGinnia?
20 A. No, I don't recall him.
21 Q. Michael Brawn?
22 A. Yes.
23 Q. Who is he?
24 A. Michael Brawn is a former deputy director at the Drug
25    Enforcement Administration.

Page 108

1  Q. Are any of these people that you're aware of openly
2     biased towards Arabs, Arab-Americans or Muslims?
3  A. We talked about Emerson.
4  Q. Right.
5  A. I don't know any of them to be. What I know of a number
6     of those folks is they're objective and I think they're
7     balanced. I think a few possibly have -- Doug Farah,
8     for instance, he wrote the book "Conflict Diamonds."
9     He's a former Washington Post article (sic). He was
10    obsessed with the Muslim Brotherhood. You have a few
11    people with -- I won't say issues, but tendencies like
12    that.
13        But by and large, I think -- I mean, if you
14    look at a guy like Mike Kraft, he was totally consumed
15    by immigration issues. He corresponded that to
16    terrorism. Do you call that bias? I don't. West was
17    very objective. I think Daveed was objective. Levitt I
18    find objective. Most of the people were.
19 Q. Did you engage in interrogation practices with
20    Arab-Americans or Muslim-Americans or persons of Arab
21    origin?
22 A. Interrogations, no; interviews, yes.
23 Q. When did you do such interviews?
24        MR. RODES: Objection. How is this within
25    the scope of an expert deposition?

Page 109

1        MR. AKEEL: It probes into bias.
2        THE WITNESS: It would have been after 9/11.
3  And as a policy statement here, the FBI did not believe
4  in the interrogation tactics so we did not participate
5  in any way, shape or form in any of those
6  interrogations. We conducted straightforward interviews
7  where we did it the good old-fashioned way, what we're
8  doing here. I happened to have a team of guys who were
9  very talented and we identified people at Guantanamo Bay
10 who were known financial facilitators.
11        I sent teams of agents down there at my
12 direction and I orchestrated the interviews. They were
13 straightforward interviews where we would build up a
14 rapport over time. We would go down there in -- my team
15 would go down in 45-day rotations. They would report to
16 me almost daily on that stuff and I would direct how
17 they would conduct the interviews. We had very
18 productive interviews. I had teams of agents after 9/11
19 that went to Abu Dhabi. We had direct access to the
20 central bank in Abu Dhabi. I had agents in the bank and
21 I would direct what they would do.
22        We identified -- I can't get into specifics.
23 We identified a key player that was close to bin Laden
24 and we worked to identify his assets and ultimately
25 worked with the intelligence community to render him.

28 (Pages 106 to 109)

Dennis Lormel
12/16/2014

Page 110

1    Now, what happened at that point, we weren't involved in
2    it. We did -- anything we did was in accordance with
3    investigative procedures and certainly in the form of
4    traditional interviews.
5    Q. (By Mr. Akeel): When you say traditional interviews,
6       that doesn't include any acts of torture, does it?
7    A. Absolutely not.
8    Q. Were you ever involved in investigating Life?
9    A. No.
10   Q. Did you ever hear of any type of investigation of Life?
11   A. Yes.
12   Q. When did you hear that?
13   A. That would be around the search warrant time period I
14      was aware of it.
15   Q. How did you become aware of it?
16   A. Either through the media or contacts that I had.
17   Q. At the time when Life was under investigation, were you
18      still working with the FBI?
19   A. Let's go back and -- let me go back and better answer
20      that question. Back in 2002 and 2003 -- maybe late
21      2001, 2002, we identified that one of the most
22      significant potential problems we had was monies that
23      were going through charities to terrorists. I'm not
24      necessarily talking about U.S. charities, but charities,
25      particularly Saudi charities, and so charities became

Page 111

1    one of our top priorities and that's when the cases
2    against the Dallas --
3    Q. Holy Land?
4    A. Holy Land, Benevolence International, Global Relief, all
5       those places. Life's name came up at that time, so I
6       was aware of Life at that time, and many other
7       charities. I don't believe at that time we investigated
8       Life. It was after I left and the Al-Hanooti thing came
9       up. I remember that case. I remember some publicity
10      about it.
11   Q. The what, Al-Hanooti?
12   A. Yes, I'm sorry. I'm mispronouncing it. I remember that
13      and so it would have been that context. I certainly --
14      after I left the FBI, I didn't receive any information
15      about ongoing investigations. I couldn't.
16   Q. Were you aware -- so before you were contacted by
17      Mr. Rodes, you had heard of Life before in your context
18      when you were working with the FBI and afterwards?
19   A. Right.
20   Q. Was there any communication made to you that Life was
21      engaging in any wrongdoing by Mr. Rodes or anyone from
22      McGuire?
23   A. No.
24   Q. Do you have any knowledge as you sit here today that
25      Life is under any investigation?

Page 112

1    A. No.
2    Q. Are you aware that Life is operational and doing its
3       thing that it's been doing the last 20 years?
4          MR. RODES: Objection; lacks personal
5       knowledge, calls for speculation.
6    Q. (By Mr. Akeel): Are you aware that it's providing
7       humanitarian aid around the world?
8    A. Yes.
9    Q. Do you speak Arabic?
10   A. No. I'm lucky I speak English.
11   Q. And you're not aware that Life is asking Bank of
12      America if it can wire?
13   A. No, I didn't know anything about that.
14   Q. Were you aware that after Life's bank account was
15      closed, Life made repeated attempts to try to
16      communicate with someone at Bank of America to try to
17      explain the problem?
18   A. Through the third complaint and through Mr. Alomari's
19      testimony, yes.
20   Q. Did you see the letters that were issued?
21   A. Yes.
22   Q. By ADC to Bank of America to try to reach someone, even
23      the human relations manager at their bank, to try to get
24      an understanding why the bank account was closed? Did
25      you see those letters?

Page 113

1    A. Yes.
2    Q. In your opinion, with the bank closure and Life is
3       engaging in efforts to find out why the bank account is
4       being closed, do you think it would be prudent on behalf
5       of the bank to engage in a discussion with its customer?
6          MR. RODES: Vague as to time period.
7    Q. (By Mr. Akeel): After the bank account was closed.
8    A. I can't speak to that, honestly, with the bank, but I
9       can tell you that's a practice that's common. It's not
10      just Life. I know of many instances where similar
11      things have happened.
12   Q. Well, are you aware of the concerns that are being
13      raised by the Arab-American community where their bank
14      accounts are being arbitrarily closed? Are you aware
15      that this is an issue?
16   A. I'm aware of the concern.
17   Q. Not just Life. Are you aware of other Arab-Americans
18      that have sustained or have experienced similar
19      situations where their bank accounts are being closed
20      arbitrarily?
21         MR. RODES: Objection to characterization as
22      arbitrarily.
23   Q. (By Mr. Akeel): Just are closed without giving any
24      reason?
25   A. Yes.

29  (Pages 110 to 113)

Dennis Lormel
12/16/2014

Page 114

1  Q. Are you aware that the Civil Rights Division of the
2     Department of Justice in the state of Minnesota has
3     launched an investigation against banks to see why
4     Arab-American bank accounts are being closed without
5     reason?
6  A. No.
7  Q. Do you have an opinion why a segment of the
8     population -- of the American population, persons of
9     Arab ethnicity, seem to be experiencing these type of
10    bank closures in comparison to other segments of the
11    population that are not of Arab ethnicity?
12        MR. RODES: Objection to the extent that it
13    hasn't been established that these closures are for any
14    sort of -- one reason or another.
15        THE WITNESS: I would attribute it to risk.
16 Q. (By Mr. Akeel): Can you please explain to me, why is
17    there -- when you say risk, what do you mean?
18 A. Where the entities have identified them, fairly or
19    unfairly, as high-risk.
20 Q. Do you think persons' names contribute to that
21    perception of possible risk if your name is Ahmed or
22    Mohammed or Samir or things like that?
23 A. It shouldn't.
24 Q. Do you believe that that can contribute?
25 A. I don't think I can answer that, honestly.  I really

Page 115

1     haven't seen it on an individual basis.  I've seen it on
2     a company basis.  I've seen, for instance -- was it Dara
3     Salam in Arlington, Virginia, they had their bank
4     account closed.
5  Q. As you sit here today, based on the records that you've
6     looked at, have you been able to discover any evidence
7     of any illegal act at all committed by Life?
8  A. No.
9  Q. Are you aware that Life has a United Nations
10    consultative status?
11 A. I believe I saw that, or something to that effect, on
12    the website.
13 Q. Do you know what that means?
14 A. No.
15 Q. Do you have a specific motivation why you agreed to be
16    an expert witness here against Life For Relief &
17    Development that you can share with us?
18        MR. RODES: Objection to characterization of
19    "against."
20        MR. AKEEL: It's against Life.  We're on the
21    other side.  We're on the side of the V.
22        MR. RODES: You put it in terms of engaged as
23    an expert against Life.  He's engaged as an expert to
24    offer testimony and to consult.
25 Q. (By Mr. Akeel): When you were asked to be an expert,

Page 116

1     you knew that the Plaintiff was Life For Relief, right?
2  A. Yes.
3  Q. Back to my question.  Do you have any motivations that
4     you can share with us on why you agreed to be an expert
5     witness for Bank of America in this case?
6  A. Just from the standpoint of reviewing the account
7     information I was presented.
8  Q. Do you have any motivations to close down -- to see what
9     you can do to try to close down Life For Relief &
10    Development?
11 A. No.
12 Q. Yesterday there was some discussion regarding the
13    corporate compliance plan that was enacted by Life's
14    fraud expert?
15 A. Yes.
16 Q. Did you have a chance to review it?
17 A. Yes.
18 Q. Do you have an opinion regarding the corporate
19    compliance plan?
20 A. It seems like a good plan.  You used the word yesterday,
21    Mike, "robust."
22        MR. AKEEL: I'd like to mark this -- I want
23    to make sure we're referencing the same one -- as
24    Exhibit 7.
25        MR. RODES: Shereef, that was provided to us

Page 117

1     and we reserve the right, to the extent necessary, to
2     supplement any of the materials that Mr. Lormel has
3     prepared after he's had a chance to subsequently review
4     that document.
5        MR. AKEEL: Of course.
6        (Whereupon Deposition Exhibit No. 7
7        was marked for identification.)
8  Q. (By Mr. Akeel): I made reference to Exhibit 7, which is
9     a corporate compliance plan.  Is that the one you were
10    referring to?
11 A. I didn't have a chance to look at it in detail.  I
12    skimmed it and certainly listened to the explanation.
13 Q. If there's anything that you believe is different than
14    what you testified to, please -- or obviously advise
15    your attorney and we can get a report, I suppose.
16        MR. RODES: Yes.
17        MR. AKEEL: This is Exhibit 8.
18        (Whereupon Deposition Exhibit No. 8
19        was marked for identification.)
20 Q. (By Mr. Akeel): We've discussed earlier regarding your
21    opportunity to review the expenses that were related to
22    the bank account.  Do you remember that line of
23    testimony?
24 A. Yes.
25 Q. Are these the expenses -- I just want to confirm -- that

30  (Pages 114 to 117)

Dennis Lormel
12/16/2014

Page 118

1  you had a chance to review and that's Exhibit 8?
2  A. Yes.
3  Q. When I look at your report, you make reference to Bates
4     269 to 270; is that accurate?
5  A. This is 268 to 271.
6  Q. Okay. So included is 269 and 270?
7  A. Yes.
8        MR. AKEEL: This is Exhibit 9.
9        (Whereupon Deposition Exhibit No. 9
10       was marked for identification.)
11  Q. (By Mr. Akeel): You authored Exhibit 9?
12  A. Yes.
13  Q. Now, if we can go to the second paragraph, it looks like
14     you reviewed the two internal audits for years 2012 and
15     2013, correct?
16  A. Correct.
17  Q. If we look in the third paragraph, you state -- in the
18     second paragraph -- or the first paragraph, it says,
19     "Both reports address independent review of the policies
20     and procedures of LFRD to detect and deter fraud. Both
21     reports provide assessments of controls in place to
22     mitigate fraud risk. I have no reason to question the
23     findings." Do you see that?
24  A. Yes.
25  Q. As you sit here today, that's true, correct?

Page 119

1  A. Yes.
2  Q. If we can go to the next paragraph, it says, "Charities,
3     especially charities such as LFRD, who operate in areas
4     of global conflict, pose an inherent high risk to fraud,
5     money-laundering and terrorist financing. Accepting the
6     audits as presented, it demonstrates that LFRD has
7     controls in place that adequately mitigate the risk of
8     fraud." Do you see that?
9  A. Yes.
10  Q. Do you agree with that?
11  A. Yes.
12  Q. Now, you agree with me as well that other charities
13     other than Life that operate in areas of global conflict
14     also pose an inherent risk to the same thing; fraud,
15     money-laundering and terrorist financing?
16  A. Yes.
17  Q. So it's not just peculiar to Life, right?
18  A. Yes.
19  Q. And then if we can continue there, "This in turn lowers
20     inherent risk of fraud and potentially places LFRD at a
21     lesser risk as an organization." Do you see that?
22  A. Yes.
23  Q. Do you agree with that?
24  A. Yes.
25  Q. Let's go to the next sentence, "The audit reports do not

Page 120

1  address the risk of money-laundering or terrorist
2  financing." Do you see that?
3  A. Yes.
4  Q. Now, what would you expect to see in the report that
5     wasn't in the report to address the risk of
6     money-laundering or terrorist financing? Do you want
7     copies of the reports to look at?
8        MR. AKEEL: Let's mark this as Exhibit 10 and
9     this as 11.
10       (Whereupon Deposition Exhibit Nos. 10 and 11
11       were marked for identification.)
12  Q. (By Mr. Akeel): I have provided Exhibit 11, Exhibit 10,
13     and then look at your Exhibit 9, okay? In that
14     sentence where it says, "The audit reports do not
15     address the risk of money-laundering and terrorist
16     financing," I guess my question is, what do you mean by
17     that?
18  A. Well, it doesn't talk about any kind of control
19     mechanism, for instance, as to the recipient of the
20     funds or what steps are in place to ensure that funds
21     don't get siphoned or diverted to terrorism for
22     terrorist financing. It doesn't talk about any
23     money-laundering -- any money-laundering considerations
24     other than those that you would associate with the fraud
25     controls. It doesn't talk about transactional activity.

Page 121

1  Q. So are you saying the specific words weren't mentioned,
2     "money-laundering"? I'll withdraw that and ask it a
3     different way. Did you hear the testimony yesterday
4     from Mr. Kaszubski who stated that anti-money-laundering
5     controls are within the internal controls? Did you hear
6     him say that?
7  A. Yes.
8  Q. More than once?
9  A. Yes.
10  Q. Did you get an understanding of what he meant by that?
11  A. Not necessarily, and I don't know that I agree.
12  Q. Let's go to the second page, for example. You see
13     where --
14  A. Which Exhibit?
15  Q. I'm sorry, Exhibit 10. Do you see where it says,
16     "Employee Controls"? Do you see that?
17  A. Yes.
18  Q. An A?
19  A. Right.
20  Q. You remember when we talked earlier today about
21     collecting cash at a local mosque and then if there's
22     three people and they all have to sign off that the
23     money is good, that that's a form of
24     anti-money-laundering control? Remember we discussed
25     that?

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 122

1    A. Yes.
2    Q. If it's in that context of employee controls in that
3       example, would you agree that it is being addressed in
4       that way?
5    A. Not specifically. That was intended to be a fraud
6       control the way I look at it. You took it to reach to
7       being a money-laundering control. It could be, but in
8       and of itself that's not enough.
9    Q. Look at J, where it says, "Corruption Controls."
10   A. Okay.
11   Q. Do you know what he meant when he said corruption
12      control?
13   A. Corruption is one of the biggest enablers of terrorism.
14   Q. Can't corruption also be -- doesn't that also seep in in
15      money-laundering? Isn't that a corruption practice?
16   A. Again, you're not talking about money-laundering.
17      You're looping money-laundering into that. That's a
18      stretch.
19   Q. Wouldn't you consider terrorist financing as fraudulent
20      since it's altering donations which could be covered by
21      fraud control?
22   A. In one sense, yes.
23   Q. Let's go to L. Do you see where it states, "Reporting
24      Controls"?
25   A. Yes.

Page 123

1    Q. Remember you had discussed earlier regarding
2       anti-money-laundering practices where you want to be
3       able to compare the sources and uses? Remember that?
4    A. Right.
5    Q. So wouldn't -- if there's reporting controls in place
6       where a report is supposed to be filed by a project when
7       it received the money, that that's a form of a control
8       to deter anti-money-laundering practices -- I mean,
9       money-laundering practices?
10   A. Not specifically. I don't disagree with you on that,
11      but the thing is, here you've got -- not to overuse the
12      word "fragment," but you're fragmenting this stuff. Why
13      don't you just have a money-laundering control in here?
14   Q. Let's say he put the word -- let's say after K, L, and
15      he had M and it's the same controls in place, but he put
16      the word "money-laundering control," then you would have
17      been happy with the report?
18   A. I wouldn't say I would have been happy. I would have
19      said it would have been more acceptable.
20   Q. Even though the same controls are in place and nothing
21      else can be added to deter --
22   A. When you look at these other controls -- and the reason
23      I say this is you don't think money-laundering with
24      those controls. You think fraud. You think corruption.
25      The intent is other than money-laundering.

Page 124

1    Q. I'm just trying to wrap something up here and that's
2       regarding what we know today and what you have been
3       advised and the information that has been shared with
4       you today. Do you agree that you can't identify
5       something that Life can additionally do other than what
6       it already has to deter or to reduce the risk of
7       money-laundering?
8    A. I think it could be better focused.
9    Q. What could be more focused? What control can be
10      implemented?
11   A. I would call it money-laundering control.
12   Q. The words I understand. I'm talking physically what can
13      be implemented that is not in place right now at Life to
14      reduce the risk of money-laundering that you can
15      identify?
16   A. From the money-laundering perspective, what are they
17      doing to identify money-laundering transactionally?
18      Money coming in, money out.
19   Q. Let me give you this scenario -- this hypothetical: 99
20      percent of the sources that are coming in are
21      identifiable by wire and checks.
22   A. Okay.
23   Q. The other one percent is what we talked about; three
24      people are verifying this. Do you agree with me that
25      Life has adequate money-laundering --

Page 125

1       anti-money-laundering controls by encouraging wire and
2       checks?
3    A. Yeah, by that. Again, in and of itself, what's the
4       source of the wire? What's the source of the checks?
5       But more importantly on the back end, the money going
6       out, what's the assurance that it's not getting siphoned
7       into a terrorist? What's the due diligence process
8       there?
9    Q. We went into Exhibit -- I gave you the example,
10      Exhibit 6. Isn't that by demanding a reporting
11      requirement to see where the funds went? That would be
12      a form of money-laundering control?
13   A. I don't know that I would call it a money-laundering
14      control. How do I know that all the money that was
15      earmarked to go there went there? How do I know, even
16      though you have this, that some of this didn't go to, as
17      has happened, to support terrorism?
18   Q. If you are --
19   A. What steps are you taking --
20   Q. Tell me another -- other than asking the beneficiary,
21      "Give us a report. Give us an accounting of where all
22      the money went. We want photographs of the wells"?
23   A. I don't see --
24   Q. Let me just say it. Let's assume all those controls are
25      in place. What other assurance can Life do to satisfy

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 126

1    your threshold?
2    A. I think I would like to see the breakdown of the funds.
3    Q. Suppose there is an accounting that shows a breakdown of
4        the funds, a report that's mandated. Suppose they
5        require that. Anything else that you think Life doesn't
6        have?
7    A. With the breakdown of the funds there and again seeing a
8        more focused description on that back end, the assurance
9        that -- you spell out your fraud assurances, an
10       assurance or some type of due diligence or checks that
11       money won't be siphoned off or isn't being siphoned off.
12   Q. You see in D, for example, there's a reference to
13       skimming controls. We talked about siphoning, right?
14   A. Yes.
15   Q. So those are in place as well, right?
16   A. That's skimming. What do you mean by skimming? Are you
17       talking about skimming by employees?
18   Q. I'm not trying to argue.
19   A. I'm not trying to argue either.
20   Q. I'm just trying to address your thing where it says,
21       "The audit reports do not address the risk of
22       money-laundering and terrorist financing." I'm saying
23       here the fact that there's reporting controls -- go on.
24   A. To a degree, yes, I think you're right.
25   Q. If you can, please look at Exhibit 11 that we talked

Page 127

1        about. Do you see where in 2013 there was an
2        enhancement plan put in place to do a source and use of
3        funds testing?
4    A. Yes.
5    Q. Now, that would also help reduce the risk of
6        money-laundering, right?
7    A. Yes.
8    Q. If we can go to the second page, do you see where
9        ReGroup advisors has committed itself to conduct
10       biweekly and an annual review of employee controls,
11       management controls, theft controls, skimming controls,
12       cash controls, check and credit card controls,
13       purchasing controls, payroll controls, operating expense
14       controls, corruption controls, conflict of interest
15       controls, reporting controls, that all these testings
16       that are being made biweekly and an annual basis that
17       also helps reduce the risk of money-laundering?
18   A. Yes.
19   Q. This is my last line of questioning, then we're done.
20       Go back to your report, please, Exhibit 1. If we can go
21       to page 14. I'd like to now go down -- we're kind of
22       gone through and I'd like to go to the third paragraph.
23       It says, "The first step" -- I do have a question before
24       I go into this. Are you aware that there is an outside
25       auditor that examines Life For Relief & Development's

Page 128

1        books to issue an independent, unqualified opinion? Are
2        you aware of that?
3    A. Yes.
4    Q. Are you aware that after review of the statements for
5        2012 and 2013, Life had received an unqualified opinion?
6    A. I wasn't aware of that.
7    Q. Are you aware that in order for Life to maintain its
8        license with state regulatory agencies that it must have
9        its annual statements audited?
10   A. Yes.
11   Q. Are you aware that Life goes through the extra effort to
12       dispatch the independent certified auditor to go
13       overseas and monitor and audit the books?
14   A. No, I wasn't aware of that.
15   Q. Would you agree with me that by taking that extra step
16       to have an accountant to go overseas and conduct an
17       audit, that that also reduces the risk of
18       money-laundering and wrongful acts?
19   A. It could, but their focus is not on money-laundering.
20       Their focus is on accounting records and doing an
21       independent review or an audit of accounting records.
22       That's different than money-laundering, but to your
23       point, yes, it can help.
24   Q. I mean, one of the concerns you brought up today was --
25       is there any monitoring going -- or auditing at the

Page 129

1        receiving end. Do you remember that?
2    A. Right.
3    Q. If you have an auditor that is actually engaging in
4        transactional audit to see if the money reached its
5        intended destination, wouldn't you agree with me that
6        Life has gone the extra step to deter money-laundering
7        or other wrongful acts?
8    A. Yeah.
9    Q. If we can please go to page 14. In the third paragraph,
10       it states, "The first step in considering whether to
11       reopen the LFRD account would be to discuss and resolve
12       issues regarding transactional activity." Do you see
13       that?
14   A. Yes.
15   Q. And then it says, "First, concerns regarding cash
16       deposits by unknown individuals to include structural
17       deposits would need to be addressed." Do you see that?
18   A. Yes.
19   Q. We've already addressed that, right?
20   A. Yes.
21   Q. Second, "BoA would have to validate the legitimacy of
22       business expenses." Do you see that?
23   A. Yes.
24   Q. We've addressed that, too, correct?
25   A. Yes.

33  (Pages 126 to 129)

Dennis Lormel
12/16/2014

Page 130

1   Q. Let's go to the next paragraph.  I'm sorry, if you can
2      go to page 15, the second step -- I'm going to the
3      second step now.
4   A. Got you.
5   Q. "Would be for BoA to conduct enhanced due diligence of
6      LFRD and the purpose of the BoA account relationship."
7      Do you see that?
8   A. Yes.
9   Q. "Regardless of how reputable an organization LFRD is and
10     how impressive their accomplishments are, they operate
11     in some of the highest risk countries in the world.  As
12     a charity operating in high-risk jurisdictions, LFRD
13     should be considered a high-risk customer."  Do you see
14     that?
15  A. Yes.
16  Q. Now, we've kind of went over the controls and things to
17     mitigate or to reduce Life For Relief as a high-risk
18     customer to an acceptable level, correct?
19  A. We've discussed that, yes.
20  Q. Now, the next paragraph we already discussed about
21     Muthanna Hanooti?
22  A. Yes.
23  Q. We go to the last paragraph, "The decision to reopen the
24     LFRD relationship rests with BoA."  Do you see that?
25  A. Yes.

Page 131

1   Q. "Based on the risk factors associated with LFRD account
2      relationship, it appears that the level of risk to
3      reopen and maintain the account is disproportionate in
4      any benefit in maintaining the account relationship."
5      Do you see that?
6   A. Yes.
7   Q. Now, "In addition, due to LFRD's fragmented banking
8      relationships, it would be difficult for BoA to satisfy
9      regulatory expectations for high-risk customers in this
10     instance."  Do you see that?
11  A. Yes.
12  Q. Now I'm going to give you this hypothetical:  Assume
13     that Life For Relief & Development would agree to have
14     all of its banking in one bank, Bank of America.  Okay
15     so far?  I'm giving you the scenario.  I just want to
16     hear a yes.
17  A. I'm sorry, yes.
18  Q. Assume that only one percent of the sources of funds
19     that Life gets is cash, and 99 is through wire and
20     checks with an identified donor -- depositor or donor,
21     okay?
22  A. Yes.
23  Q. That's hypothetical number two.  So far so good?
24  A. Yes.
25  Q. Number three, assume that Life For Relief & Development

Page 132

1      has implemented the robust corporate compliance plan.
2   A. Yes.
3   Q. Assume that Life For Relief & Development has in its
4      last annual financial statements received an unqualified
5      opinion that the financial statements represent in all
6      material respect the financial condition of the
7      organization.
8   A. Yes.
9   Q. Assume that Life For Relief & Development is committed
10     to reporting requirements from overseas offices where
11     the reports are to be broken down in cost and the
12     reports are to be provided back to the Southfield office
13     within 30 days, with pictures, with documentation
14     regarding where the funds were applied and with a full
15     report, okay?  So far so good?
16  A. Yes.
17  Q. Assume that Life For Relief will have all of its
18     internal controls in place regarding the one percent
19     cash that it collects where it has three people that
20     monitor the cash that's being collected at the local
21     mosques, okay?
22  A. Yes.
23  Q. Now, based on what I have just told you -- and I want to
24     go back to this paragraph now where it states, "It
25     appears that the level of risk to reopen and maintain

Page 133

1      the account is disproportionate to any benefit."  Would
2      you agree with me that based on the controls that I have
3      submitted to you, and I would have to prove them, that
4      if I prove all this is true, that the level of risk to
5      reopen and maintain Life For Relief & Development's bank
6      account is proportionate to any benefit -- to the
7      benefit in maintaining the account relationship?
8   A. I would say could be.  Again, you still have a couple
9      other factors, but it could be.  Certainly my comfort
10     level would be better.
11  Q. What are the other factors?
12  A. Again, it's the geography, the fact that Bank of America
13     needs to do their own enhanced due diligence.
14  Q. You agree with me that the factors that you've mentioned
15     would be existent to any other charity as well?
16  A. Absolutely.
17  Q. If Bank of America had opened its accounts to those
18     charities where the inherent risk is similar, then that
19     would be a consideration to open the bank account for
20     Life?
21  A. Should be.
22         MR. AKEEL:  Just give me one minute.
23         (Brief pause in proceedings.)
24         MR. AKEEL:  I have just a couple of
25     questions.

34  (Pages 130 to 133)

Dennis Lormel
12/16/2014

Page 134

1  Q. (By Mr. Akeel):  Sir, when I was questioning you on the
2     sources of funds, I indicated that one percent is cash
3     and the rest is check and wire.  Were you aware that in
4     fact one-third is credit card, one-third is check and
5     one-third is wire and the one percent is cash?  Were you
6     aware of that?
7  A. No.
8  Q. Would you agree with me that the use of a credit card
9     and the encouragement of the use of a credit card
10    through the website is a further practice that lowers
11    the risk of money-laundering activity?
12 A. In general, yes.  I think there are some impediments
13    there that need to be overcome, but with the control
14    mechanisms you can deal with that.
15 Q. Finally, the last question is, you know I had raised
16    that issue about -- I gave you all of those factors that
17    I have to prove that are in place, hypothetically, and
18    if they're all in place, then Bank of America could open
19    the account.  Is there a factor in your mind that if the
20    organization is not run by Arab-Americans that that is
21    even a lower risk for the bank to open an account?
22 A. No.  If I thought that, I wouldn't be sitting here.
23       MR. AKEEL:  I have no further questions.
24 EXAMINATION BY MR. RODES:
25 Q. I want you to pull out your report, Exhibit 1, and if

Page 135

1     you could, just flip back to page 19, Exhibit 1.
2     Mr. Akeel asked you some questions about some of the
3     materials in this list.  You have items one through 101,
4     okay?  Every single thing listed in here, did you rely
5     on the information in every single one to create your
6     opinion?
7  A. No.
8       MR. AKEEL:  Objection; leading.
9  Q. (By Mr. Rodes):  Are some of these -- one through 101,
10    are some of these simply results that came up in
11    internet searches?
12 A. Yes.
13 Q. Was part of your -- in creating your report and doing
14    some of your own independent research, did you Google
15    the name Life For Relief?
16 A. Yes.
17 Q. When you Googled the name Life For Relief, is that when
18    the MilitantIslamMonitor.org website showed up as a
19    result?
20 A. Yes.
21 Q. Independent of searching for the name Life for Relief on
22    Google or whatever search you used, did you specifically
23    go to MilitantIslamMonitor.org?
24 A. No.
25 Q. Is MilitantIslamMonitor.org a website that you would

Page 136

1     rely on in terms of forming an opinion?
2  A. No.
3       MR. AKEEL:  Objection; leading.
4  Q. (By Mr. Rodes):  Same questions with respect to The
5     Investigative Project website.  Did you go specifically
6     to The Investigative Project website to look up
7     information on Life For Relief?
8  A. Yes.
9  Q. And why is that?
10 A. Again, they have good investigative files out there in
11    terms of case history and legal cases and references to
12    names and entities and individuals.
13 Q. Would you say that that information is separate from any
14    sort of editorializing that may be done by Steven
15    Emerson on the information?
16 A. Yes.
17       MR. AKEEL:  Objection; leading.
18 Q. (By Mr. Rodes):  Did you rely on any opinions by
19    Mr. Emerson in forming your opinions in this report?
20 A. No, just on the information that was contained in those
21    files, which is public source court records for the most
22    part.
23 Q. If not specifically relied upon in forming an opinion,
24    why would you include a particular piece of material in
25    Exhibit 1?

Page 137

1  A. That I had gone to those sites and I reviewed
2     information on those sites.  I make a note that that's
3     where I've been.
4  Q. Is that your standard practice?
5  A. Yes.
6  Q. I think you testified in response to a question posed by
7     Mr. Akeel, Mr. Akeel had asked you if you had thus far
8     seen any evidence of any sort of money-laundering by
9     Life For Relief and I believe your answer was you have
10    not; is that correct?
11 A. Yes.
12 Q. Is that the same as saying that the activity is not
13    possibly indicative of money-laundering?
14       MR. AKEEL:  Objection; leading.
15       THE WITNESS:  Can you repeat that?
16 Q. (By Mr. Rodes):  Yeah.  Is that the same as saying that
17    the activity that was reviewed in 2012, 2011 by the
18    bank's investigator was not possibly indicative of
19    money-laundering?
20       MR. AKEEL:  Objection.
21       THE WITNESS:  I'm not sure I understand.
22 Q. (By Mr. Rodes):  Is there a distinction in your mind
23    between evidence of money-laundering and transactional
24    activity that could indicate money-laundering?
25 A. Yes.

35  (Pages 134 to 137)

Dennis Lormel
12/16/2014

Page 138

1   Q. So while you testified that you did not -- and you're
2       not aware of evidence of money-laundering, what is your
3       testimony with respect to whether or not the activity
4       that was reviewed when the account was closed could
5       possibly indicate money-laundering?
6   A. Yes, the activity -- transactional activity did have red
7       flags for money-laundering.
8   Q. Does a bank investigator -- in your 41 years of
9       experience, does a bank investigator need to come to a
10      conclusion of a financial crime such as money-laundering
11      in order to recommend closure of an account?
12  A. No. The financial investigator from a financial
13      institution is responsible to identify suspicious
14      activity or potential suspicious activity. Law
15      enforcement is responsible for following through and
16      determining whether it's a criminal activity.
17  Q. Is the threshold for identifying suspicious or unusual
18      activity different than a threshold for finding evidence
19      of actual crime?
20  A. Yes. The threshold for identifying suspicious activity
21      is much lower and that's based on a number of warning
22      signs, red flags, anomalies. Certainly the threshold
23      for identify -- for proving a criminal offense is a much
24      higher standard.
25  Q. In your experience, is that an industry-wide standard in

Page 139

1       terms of the threshold for finding unusual or suspicious
2       activity versus criminal activity, as you've testified?
3   A. Yes. I make it a point -- I do a lot of teaching and
4       when I talk to financial institution investigators in
5       particular, remind them that their job is not -- they're
6       not responsible for identifying criminal activity.
7       They're responsible for identifying suspicious activity.
8       Whether it's criminal and proving it's criminal, that's
9       for law enforcement.
10  Q. Is there some sort of regulatory obligation that AML
11      investigators in banks are held to in order to report
12      suspicious activities?
13  A. I think the biggest failure in the banking industry is
14      the failure to file suspicious activity reports -- or
15      file adequate suspicious activity reports. Yes, there
16      is a very high standard when it comes to -- one of the
17      very first things the regulators are going to do when
18      they come in to do an examination is look at the bank's
19      suspicious activity filings.
20  Q. Is it your opinion based on what you've reviewed, based
21      on the materials you've reviewed, that Investigator
22      Christa Marshall reviewed, is it your opinion that that
23      information -- that the account activity reviewed was
24      indicative of potential suspicious activity?
25  A. Yes.

Page 140

1           MR. AKEEL: Objection; leading.
2   Q. (By Mr. Rodes): What is your impression of the --
3       strike that. You testified that you have greater
4       comfort level based on the testimony of Mr. Kaszubski
5       yesterday and maybe some information that you've heard
6       today based on -- regarding how Life For Relief has
7       implemented certain control procedures governing their
8       internal operations; is that correct?
9   A. Yes.
10  Q. Are you aware of whether or not Bank of America had
11      access to those materials at the time it closed the
12      account in 2012?
13  A. No, I'm not.
14  Q. Do you have any reason to believe that Bank of America
15      would have known or received any evidence -- Bank of
16      America or any of its investigators would have had
17      information relating to the controls that Life For
18      Relief may or may not have had in place at the time in
19      2011 or 2012?
20  A. No.
21  Q. Does the bank have an obligation during an AML
22      investigation and review to seek out that kind of
23      control information from a client like Life For Relief?
24  A. No.
25  Q. In connection with an AML review, was it proper for

Page 141

1       Investigator Marshall and for Ms. Digsby to not reach
2       out to Life For Relief?
3   A. Yes.
4   Q. Why is that?
5   A. AML investigators typically do not reach out to clients.
6       Other components in the bank may, but
7       anti-money-laundering investigators for the most part do
8       not. Some do, but I think basically across the industry
9       you'll find that the practice is that they don't.
10  Q. Was it consistent with your understanding of the
11      industry standard for Marshall and Digsby or anyone in
12      connection with this AML review to not reach out to Life
13      For Relief?
14  A. Yes.
15  Q. Is there any particular reason why it would possibly be
16      unadvisable or why it would be consistent with industry
17      standard to not reach out?
18  A. Yes, because one reason in particular is that if they
19      disclosed that they had identified suspicious activity
20      or that they reported suspicious activity, that's a
21      serious breach and a violation.
22  Q. Violation of what?
23  A. Violation of the law, and bankers can be prosecuted and
24      have been prosecuted for that.
25  Q. Are you referring to a specific law?

36 (Pages 138 to 141)

Dennis Lormel
12/16/2014

Page 142

1   A. The BSA, Bank Secrecy Act.
2   Q. Is it accurate from your knowledge -- you're familiar
3      with the Bank Secrecy Act?
4   A. Yes.
5   Q. Very, very familiar with the Bank Secrecy Act?
6   A. Yes.
7   Q. It comes up in your daily practice?
8   A. For the most part, yes.
9   Q. And in your prior experience as an investigator and in
10     the FBI, Bank Secrecy Act was an issue?
11  A. Yes.
12  Q. And the Bank Secrecy Act has a specific provision that
13     SARs or information leading to SARs is not to be
14     disclosed except for regulatory reporting purposes?
15  A. Yes.
16  Q. So if an investigator reviewed activity that he or she
17     believed to be suspicious, it would be consistent with
18     industry standards and appropriate in your opinion is
19     not divulge that information to the target of that
20     investigation?
21  A. Yes.
22  Q. And in fact, they're prohibited from doing so?
23  A. Yes.
24  Q. I believe that you testified in response to some
25     questions from Mr. Akeel regarding wire transactions

Page 143

1      having some greater -- giving you a higher level of
2      comfort than, for example, cash transactions in terms of
3      verification of the funds; is that correct?
4   A. Yes.
5   Q. In connection with the wire transaction, though, how
6      would it be that you could identify or confirm how the
7      funds on the receiving end were going to then be
8      implemented and used?
9   A. Based on the transactional information, I wouldn't have
10     that information.
11  Q. Is there anything that you've seen that would indicate
12     that Life For Relief has any policy in place that would
13     in fact confirm how those funds were used on the
14     receiving end?
15  A. No.
16  Q. Is that something you think would be consistent with AML
17     standards, that they should have that in place?
18  A. Yes.
19  Q. Even if Life For Relief had such a policy or procedure
20     in place, is there any reason to believe that the bank,
21     at the time it conducted the investigation, would have
22     had that info?
23         MR. AKEEL: Objection; speculation.
24         THE WITNESS: No.
25  Q. (By Mr. Rodes)  Do you have any -- is there any

Page 144

1      evidence indicating that the bank had any information
2      about any kinds of AML controls or policies at the time
3      it closed the accounts and reviewed the accounts?
4   A. No.
5   Q. Did it have an obligation to seek that information out?
6   A. No.
7   Q. Could seeking that information out have possibly
8      undermined the investigation?
9   A. Possibly, yes.
10         MR. AKEEL: Objection; foundation.
11  Q. (By Mr. Rodes)  You're aware that Ms. Marshall
12     originally was looking at an entity called Syria Relief
13     & Development in response to an FBI tip?
14  A. Yes.
15  Q. It's your understanding that Life For Relief became a
16     subject of inquiry because of transactions between Syria
17     Relief and Life For Relief?
18  A. Yes.
19  Q. Was it appropriate procedure for Ms. Marshall to look at
20     Life For Relief after it saw a transaction between the
21     original target of an FBI inquiry and Life For Relief?
22  A. Yes.
23  Q. Is that a component of an anti-money-laundering review?
24         MR. AKEEL: Objection; foundation.
25         THE WITNESS: Yes, it would be.  It would be

Page 145

1      good diligence on the part of the investigator; in this
2      case, Ms. Marshall.
3   Q. (By Mr. Rodes)  Is it standard in your experience for
4      bank investigators to take a review of a target to that
5      second level in terms of where the money is going to
6      from the original target?
7   A. Yes.
8   Q. With regard to donations coming in in the form of
9      checks, I believe you also testified similar to wiring,
10     that money coming in the form of a check was less
11     problematic or less risky than money coming in as cash;
12     is that accurate?
13  A. Yes.
14  Q. Do checks present the same issues in terms of
15     confirmation of the ultimate use on the receiving end as
16     we've discussed?
17  A. Yes.
18  Q. And again, are you aware of any -- from what you've
19     heard today, anything that you've heard today from
20     anyone who's presented any information, including Life
21     For Relief's witnesses, expert witness, that Life For
22     Relief has in place a policy to address the issue of end
23     use of funds in terms of on a transactional level?
24  A. No.
25  Q. Is there a difference between a fraud investigation and

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 146

1      an AML investigation?
2    A.  Yes.
3    Q.  What is the difference?
4    A.  A couple of things.  And again, let's put this from the
5        bank investigative perspective, and that would be that
6        an AML investigator, his responsibility or her
7        responsibility is to identify suspicious activity.  A
8        fraud investigator, their responsibility is to identify
9        assets or potential loss or actual loss to the bank and
10       to take steps to recover that or to ensure that the bank
11       doesn't find itself in a loss position.
12   Q.  Would it be -- is there a difference between the two
13       kinds of investigations regarding contact with the
14       target of the investigation?
15   A.  Yes.  I think in my experience, fraud investigators
16       would be more inclined to actually contact the client,
17       because again, to determine what the potential loss
18       situation is -- monetary loss to the bank or exposure to
19       the bank.  Importantly, it's what exposure do they have.
20       In the course of that type of investigation, they may be
21       more inclined to speak to the bank and they're not
22       speaking in that context from an AML standpoint about
23       suspicious activity.
24   Q.  For the reasons that you've testified?
25   A.  Yes.

Page 147

1    Q.  What kind of investigator was Christa Marshall?
2    A.  She was an anti-money-laundering investigator.
3    Q.  Are you aware that the bank has separate departments for
4        money-laundering investigations and fraud
5        investigations?
6    A.  Yes.
7    Q.  Was Christa Marshall in the fraud or AML group?
8    A.  AML group.
9    Q.  Do you know if Ms. Digsby fell into a particular
10       category?
11   A.  She was in a different environment.  She was a -- I
12       forget what unit or section she was in, but she was in
13       neither.  She was in a position of reviewing and either
14       approving or disapproving the recommendation to close
15       the account.
16   Q.  Would she have been as equally subject to the BSA
17       regulations as Ms. Marshall would have been in terms of
18       no contact?
19   A.  Yes.
20           MR. AKEEL:  Objection; legal conclusion.
21           MR. RODES:  I think he's testified to his
22       familiarity with the law.
23   Q.  (By Mr. Rodes):  Are there any controls that Life For
24       Relief can put in place in the case of bank deposits
25       totaling more than $10,000 in the same day?

Page 148

1    A.  Yes.
2    Q.  What would that be?
3    A.  Either just make one deposit, or if they're breaking the
4        deposits up, that one individual make those deposits and
5        make it known to the point it was made earlier, that the
6        monies are earmarked for different purposes, but there's
7        no reason why you can't just make one deposit and then
8        when the money is there from the accounting standpoint,
9        identify where the money is going.
10   Q.  Are you aware if -- whether or not Life For Relief,
11       based on everything you've heard so far, including
12       yesterday's testimony, that Life For Relief has a policy
13       in place regarding how those large deposits are handled?
14   A.  No.
15   Q.  Do you know if Bank of America -- do you have any reason
16       to believe or any evidence that Bank of America, at the
17       time of the closure, would have been aware of any
18       existing policy at the time regarding the handling of
19       deposits over 10,000?
20   A.  No.
21   Q.  Would it have been Bank of America's obligation to seek
22       that information out?
23   A.  No.
24   Q.  You looked at some of these deposit forms that Mr. Akeel
25       showed you, Exhibit 5, which I will show you my version.

Page 149

1        I put number "5" in the top right corner; otherwise,
2        it's unadulterated.  Looking at this deposit form on the
3        first page here, is there any reason to believe that a
4        donor is prohibited from putting their name on that
5        form?
6    A.  No.
7    Q.  Are you aware of any sort of bank policy that would
8        prohibit them from doing that?
9    A.  No.
10   Q.  Would it be a reasonable control for Life For Relief to
11       ask donors to make identified deposits?
12           MR. AKEEL:  Objection.
13           MR. RODES:  On what basis?
14           MR. AKEEL:  Calling for speculation.
15           THE WITNESS:  They could, yes.
16   Q.  (By Mr. Rodes):  In your experience and in terms of what
17       you've heard Mr. Kaszubski testify about in terms of the
18       controls Life For Relief is implementing, do you believe
19       -- in your understanding of the various standards by
20       which Life For Relief has chosen to govern itself, do
21       you believe it would be a reasonable control to ask Life
22       For Relief to ask donors to make identified deposits?
23   A.  Yes.
24   Q.  Do you believe that -- is it your understanding that
25       Life For Relief is encouraging the use of credit card

38  (Pages 146 to 149)

Dennis Lormel
12/16/2014

Page 150

1    donations of its donors?
2    A.  Is encouraging it?  Well, based on the comment, yes.
3    Q.  Based on Mr. Akeel's comment, is it your understanding
4        that Life For Relief is encouraging its donors to donate
5        by credit card?
6    A.  Yes.
7    Q.  Are credit cards a more identifiable way of making a
8        donation than a cash deposit?
9    A.  Yes.
10   Q.  Why is that?
11   A.  Well, assuming that you've vetted the identity of the
12       credit card and you're comfortable with it, you know who
13       the donor is.
14   Q.  Do you have any evidence that Life For Relief was
15       encouraging the use of credit card donations over cash
16       donations at the time the accounts were reviewed and
17       closed?
18   A.  No.
19   Q.  Similarly to asking donors to make identified deposits,
20       would it be a reasonable control for Life For Relief to
21       encourage its donors to make donations by checks that
22       contain their personal information so as to identify a
23       source?
24   A.  Yes.
25   Q.  Do you have any evidence or reason to believe that there

Page 151

1    was any sort of encouragement of that by Life For Relief
2    at the time the accounts were reviewed and closed?
3    A.  No.
4    Q.  Is it your understanding that Life For Relief is still
5        implementing and developing source and use policies that
6        were not in place in 2011 and 2012?
7    A.  No.
8    Q.  Does your understanding come from Mr. Kaszubski's
9        testimony yesterday?
10   A.  Yes.
11   Q.  Is it your understanding that Mr. Kaszubski was an
12       expert regarding the policies and controls that Life For
13       Relief has implemented internally in terms of the
14       deposit activity and the flow of funds?
15   A.  Yes.
16   Q.  Would you make any distinction between source of funds
17       and the name of the person who's depositing the funds?
18   A.  The name of the person depositing isn't necessarily
19       responsible for the source.  That's not necessarily the
20       source to the examples that were used earlier.  The name
21       of the person depositing may have been the employee
22       who's collected the cash or whatever and deposited it.
23   Q.  Do you have any information or indication or evidence
24       based on what you've heard that Life For Relief has some
25       sort of policy or procedure in place to identify the

Page 152

1    actual source of the funds as distinguished from the
2    name of the person depositing them?
3    A.  No.
4    Q.  Is that something they should have in place in terms of
5        AML compliant policy?
6    A.  That would be a good practice.
7    Q.  Not required, but good practice?
8    A.  Yes.
9    Q.  Based on your testimony, is it accurate to say that a
10       proper AML control, policy or procedure would involve a
11       review on the transactional activity level?
12   A.  Yes.
13   Q.  That would involve looking at specific transactions
14       coming in and out of specific accounts?
15   A.  Yes.
16   Q.  Would that also involve verification of where those
17       funds originated from and how those funds were
18       ultimately used?
19   A.  Yes.
20   Q.  From what you understand and everything that you've
21       heard, including testimony of expert Mr. Kaszubski, does
22       Life For Relief have any kind of transactional level
23       approach to anti-money-laundering?
24   A.  Not from what I've reviewed.
25   Q.  Would that be something that would mitigate risk if they

Page 153

1    did have one?
2    A.  Yes, it would be helpful.
3    Q.  Would that mitigate risk from a bank perspective based
4        on your experience?
5    A.  From the bank perspective, yes.
6    Q.  Do you have any reason or evidence to believe that Bank
7        of America was aware of any kind of policy at the time
8        the accounts were reviewed and closed?
9    A.  No.
10   Q.  Did Bank of America have an obligation to seek that out?
11   A.  No.
12   Q.  Looking at the account closure form, that's Exhibit 4,
13       can you flip to the second page of Exhibit 4?  On the
14       bottom is Bates number 36, version three.
15   A.  Right.
16   Q.  It's a less-redacted version.  I'll represent to you
17       it's a less-redacted version of the same document that
18       is the first page of Exhibit 4.  There's a box that's
19       checked toward the bottom, and the box states,
20       "Investigation results yield conclusive indications of
21       violations of anti-money-laundering laws and/or Bank
22       Secrecy Act regulations."  Do you see that?
23   A.  Yes.
24   Q.  Does that phrase encompass structuring?
25           MR. AKEEL:  Objection; speculation, leading.

39  (Pages 150 to 153)

Dennis Lormel
12/16/2014

Page 154

1    Q. (By Mr. Rodes): Based on your experience with the Bank
2       Secrecy Act, with structuring, financial crimes, could
3       that sentence include the activity of structuring?
4    A. Yes, it could be.
5            MR. AKEEL: Objection; speculation, leading.
6    Q. (By Mr. Rodes): Would structuring be a violation of the
7       anti-money-laundering law?
8    A. Yes.
9    Q. Would structuring be a violation of the Bank Secrecy Act
10      regulations?
11   A. Yes.
12   Q. Do you know if -- it is industry standard for an
13      investigator to have to identify or to have to check
14      more than one of these boxes on a form like this that
15      banks use in terms of account closure recommendations?
16           MR. AKEEL: Objection; form, foundation.
17           THE WITNESS: No.
18   Q. (By Mr. Rodes): And regarding the box that is checked,
19      the statement I've read to you and the narrative account
20      that I think has been read into the record previously,
21      can you opine on whether or not that statement and the
22      underlined portion of the checked box would encompass
23      the three above unchecked boxes?
24           MR. AKEEL: Objection; form, foundation,
25      speculation.

Page 155

1            THE WITNESS: In my mind it does.
2    Q. (By Mr. Rodes): In your experience in financial crimes
3       and consulting, in terms of investigations of what bank
4       investigators look at, could you testify that the
5       statement in the checked box would encompass the three
6       unchecked boxes?
7            MR. AKEEL: Objection; form, leading,
8       foundation.
9            THE WITNESS: Yes.
10           MR. AKEEL: And speculation.
11   Q. (By Mr. Rodes): In looking at your report -- back to
12      Exhibit 1, page 13, in the middle paragraph a few
13      sentences down, there's a sentence that starts with,
14      "The problem with this pattern of transactional
15      activity." Do you see that?
16   A. You said 13?
17   Q. Yes, page 13.
18   A. Yes.
19   Q. Okay. The next sentence starts with, "What LFRD did was
20      a form of commingling funds."
21   A. Right.
22   Q. I believe that based on a series of questions that
23      Mr. Akeel asked you that you testified to the extent
24      that commingling wouldn't be the proper word in that
25      sentence?

Page 156

1    A. Right.
2    Q. What word -- is there a word to put in there?
3    A. Yeah. I would change that entire sentence under the
4       circumstances with "commingling" out. It's just trying
5       to drive back the point that there's a lack of
6       transactional transparency.
7    Q. What led to the lack of transparency, in your opinion?
8    A. Well, just from the standpoint of the one bank account,
9       the fact that there's a check for $100,000, that's all
10      that the Bank of America investigator is going to see;
11      in this case, Ms. Marshall, that that check sat there in
12      that account that was earmarked for charitable purposes.
13      Bank of America would not know that that money was
14      actually going to a charitable purpose from another
15      account.
16   Q. In connection with an AML investigation, is it
17      appropriate in your opinion for Ms. Marshall to not have
18      reached out to confirm why that check was deposited in
19      that operational account?
20   A. Yes.
21           MR. AKEEL: Objection; asked and answered.
22   Q. (By Mr. Rodes): On page 16 of your report, the third
23      full paragraph down.
24   A. Okay.
25   Q. The third full paragraph down, starting with the

Page 157

1       "Fragmented nature."
2    A. Okay.
3    Q. The next sentence, "This risk is compounded by the
4       nominal nature of the BoA accounts and the fact it is
5       not consistent with activities conducted by charities."
6       I think that you testified in response to questions by
7       Mr. Akeel about knowledge regarding charities generally.
8       Is that what you meant in this sentence?
9    A. Yes.
10   Q. What did you mean by not consistent with activities
11      conducted by charities?
12   A. What you would expect was the account activity --
13      consistent with what you would expect for that type of a
14      business; in this case, the charity.
15   Q. Is there anything that you've heard today, yesterday or
16      anything that's come to your attention since the
17      preparation of your report in this matter that would
18      lead you to change your opinion that proper standards
19      were followed in connection with the closure and review
20      of the Life For Relief accounts at Bank of America?
21   A. No.
22   Q. And is there anything that would lead you to change your
23      opinion that the review was proper under industry and
24      AML guidelines?
25   A. No.

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 158

1  Q. In any of your work as an expert or consultant, has
2     there ever been any finding or conclusion that you were
3     biased against Arab-Americans or people of Middle
4     Eastern or Arabic descent?
5  A. No.
6  Q. Have allegations of this kind of ethnic bias been levied
7     against you in any context other than today?
8  A. No.
9  Q. Were you hired by Bank of America to suss out whether or
10    not there was illegal activity being conducted by Life
11    For Relief?
12 A. No.
13 Q. Has anyone in my firm or associated with our side of the
14    case ever asked you if Life For Relief engaged in
15    criminal activity?
16 A. No.
17 Q. Do you recall Mr. Kaszubski testifying yesterday that
18    Life For Relief is in the process of implementing
19    additional controls regarding the use of funds?
20 A. Yes.
21 Q. Do you recall -- I was pointing to Exhibit 11, the last
22    bullet point there. So above the last bullet point you
23    see there is a statement that says, "The new risk area
24    assessments were incorporated into the 2013 overall plan
25    and will continue to be enhanced throughout 2014.

Page 159

1     Specific 2014 enhancement plans include," and there's a
2     bullet point there, "Source and use of fund policy
3     revision to incorporate third-party flow-through on use
4     of funds and durable goods. The enhancement will
5     provide a basic layer of testing to ensure the third
6     party is properly maintaining the use of funds according
7     to their mission goal and commitment to Life For Relief
8     & Development." Do you see that?
9  A. Yes.
10 Q. Is it your understanding that Life For Relief does not
11    yet have such a policy in place?
12 A. Yes.
13 Q. Is it your understanding based on Mr. Kaszubski's
14    testimony and all of the evidence that's been presented
15    to you that Life For Relief did not have this kind of
16    policy when the accounts were reviewed and closed?
17       MR. AKEEL: Objection; leading, the last two
18    questions.
19       THE WITNESS: Yes.
20 Q. (By Mr. Rodes): Do you have any evidence that Bank of
21    America would have been aware of the existence of any
22    kind of policy if it did exist in the time that the
23    accounts were reviewed and closed?
24 A. No.
25 Q. Would Bank of America have been under a legal obligation

Page 160

1     or some other obligation to seek that information out?
2  A. No.
3        MR. AKEEL: Objection; form, foundation.
4  Q. (By Mr. Rodes): Is this the kind of policy, this
5     enhancement that we're referring to, is this the kind of
6     policy that would give you some -- would alleviate some
7     of your concerns regarding risk in terms of confirming
8     use of funds?
9  A. Yes.
10 Q. Does the implementation of this enhancement today, in
11    your opinion, have any bearing upon the closure of the
12    accounts in 2012?
13 A. No.
14 Q. You testified -- Mr. Akeel gave you a several-layer
15    hypothetical today regarding various policies and
16    controls that Life For Relief could have in place in
17    order to alleviate your concerns regarding the controls
18    and money-laundering; is that accurate?
19 A. Yes.
20 Q. Let's take the hypothetical and let's make an additional
21    layer on it and say that these were in place in 2012
22    when the accounts were closed, okay? Do you know
23    whether or not the bank would have seen these policies?
24 A. No.
25 Q. Do you have any evidence that Life For Relief had

Page 161

1     provided any kind of policies in existence at the time
2     to Bank of America?
3  A. No.
4  Q. Would Bank of America have been obligated to seek out
5     those policies in connection with this AML review in
6     2012?
7  A. No.
8  Q. Is it accurate -- would it be accurate to say that even
9     if all of these policies that they've been working to
10    put in place were firmly in place at the time the
11    accounts were reviewed and closed, that it would not
12    have altered how the transactional activity would have
13    shown up when Ms. Marshall did her account review?
14       MR. AKEEL: Objection; form, foundation.
15       THE WITNESS: Yes.
16 Q. (By Mr. Rodes): Do any of the policies that Life For
17    Relief has either implemented or planning on
18    implementing, do any of those policies or procedures,
19    would they alter the transactional activity that would
20    come through the bank accounts at Bank of America were
21    they still to be open?
22 A. No.
23 Q. In that sense, do the policies not alleviate your
24    concerns from an AML transactional perspective?
25 A. No.

41 (Pages 158 to 161)



Dennis Lormel
12/16/2014

Page 162

1  Q. Is there anything that you testified to today that you
2     would like to clarify or amend?
3  A. No.
4  Q. You will have a chance once the transcript comes back,
5     but for the time being --
6  A. No.
7        MR. RODES: Okay.
8        MR. AKEEL: Just a couple questions.
9  RE-EXAMINATION BY MR. AKEEL:
10 Q. Sir, regarding Exhibit 4, would you expect the Bank of
11    America employees to comply with Federal law and to
12    complete the form properly?
13       MR. RODES: Objection; lacks foundation.
14 Q. (By Mr. Akeel): The closure report right here?
15 A. Yes.
16 Q. Would you expect that they would file the proper SAR
17    report if needed?
18       MR. RODES: Objection to the extent the
19    question calls for whether or not a SAR was filed under
20    the Bank Secrecy Act. It cannot be disclosed if one was
21    filed or not, and by making this objection I'm not
22    indicating that one has been filed or has not been
23    filed.
24       THE WITNESS: Could you repeat that?
25 Q. (By Mr. Akeel): Sure. Would you expect the Bank of

Page 163

1     America employees to follow Federal law with respect to
2     filing a SAR report if needed, generally?
3  A. Yes.
4  Q. In preparing this closure report, would you expect
5     Ms. Marshall to put accurate representations on the
6     form? Would you expect that?
7  A. Yes.
8  Q. Would you expect her to be honest with respect to her
9     reasons why the account should be closed?
10 A. Yes.
11 Q. Would you expect her to have filled out the form
12    properly to justify the decision to close it?
13 A. Yes, and --
14 Q. I'm just asking.
15 A. Yes. And as I started to say earlier and I was
16    searching for it, Mr. Rodes pointed out that last bullet
17    where she checks the boxes really all-encompassing.
18    Could she have identified structuring? Yes.
19 Q. I understand, but you're going into her state of mind on
20    what she thought, correct? You weren't there to
21    consult?
22 A. I'm going based on her deposition.
23 Q. I understand, but you weren't there at the time when she
24    completed the form, right?
25 A. You're right.

Page 164

1  Q. She didn't fill out the box "structuring," correct?
2  A. Correct.
3  Q. It's very specific, to the point, right?
4  A. Yes.
5  Q. In the banking industry, everybody knows what structured
6     transactions mean, right?
7  A. Supposedly, yes.
8  Q. In fact, there's a separate box from the other boxes,
9     correct?
10 A. Yes.
11 Q. Let's go to that last page, please, additional Bank of
12    America accounts. Do you recall you testified earlier
13    about that Life For Relief is a high-risk factor because
14    of where it provides humanitarian aid?
15 A. Yes.
16 Q. Do you see the box where -- the second from the last
17    box, it says, "Customer has been identified or
18    associated with a government-acknowledged high-risk
19    area/entity/country"? Do you see that?
20 A. Yes.
21 Q. That's not been boxed, is it?
22 A. It hasn't been checked.
23 Q. It hasn't been checked, correct?
24 A. Yes, correct.
25 Q. Based on what you see here in this closure report, Bank

Page 165

1     of America did not consider Life For Relief &
2     Development -- it was not identified as a government-
3     acknowledged high-risk area or entity, correct?
4        MR. RODES: Objection; calls for speculation,
5     lacks foundation, lacks personal knowledge, to the
6     extent that your question asked whether or not they
7     considered. You also said identified. I'm objecting to
8     the part where you said "considered."
9  Q. (By Mr. Akeel): Do you agree?
10 A. Yes.
11       MR. RODES: To which part of the question?
12    Objection; compound.
13 Q. (By Mr. Akeel): Regarding Bank of America's duty to
14    contact the customer, you read Ms. Digsby's deposition
15    where she said at times from the AML unit she contacted
16    customers?
17 A. Right.
18 Q. Last question. You indicated that it's your
19    understanding that if there was a transactional level
20    money-laundering control, you would have been more
21    comfortable. Can you identify as you sit here today a
22    transactional level money-laundering control that's not
23    in place at Life?
24       MR. RODES: Objection. You're asking him to
25    prove a negative.

42 (Pages 162 to 165)

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

Dennis Lormel
12/16/2014

Page 166

1       THE WITNESS:  I can't say.
2       MR. RODES:  And objection, facts not in
3   evidence in terms of some policies not being in place
4   yet.
5       MR. AKEEL:  I'm done.
6       MR. RODES:  One question.
7   RE-EXAMINATION BY MR. RODES:
8   Q.  In the closure form and all the different versions
9   you've seen, based on everything you know sitting here
10  today, is there anything on that form that is
11  inaccurate, to your knowledge?
12  A.  No.
13  Q.  Anything that's false?
14  A.  No.
15      MR. RODES:  Okay.
16      MR. AKEEL:  We're done.
17      (Deposition concluded at 3:24 p.m.)
18
19
20
21
22
23
24
25

Page 167

1           J U R A T
2
3
4           I, DENNIS LORMEL, do hereby attest to the
5   correctness of the transcript upon inclusion of the
6   corrections and/or changes I have listed on the attached
7   errata sheet.
8
9
10
11  _____
12  Dennis Lormel
13
14  Subscribed and sworn to before me
15  this____day of_____, 2015
16
17
18  _____
19
20  Notary Public, _____County
21  My Commission expires:_____
22
23
24
25

Page 168

1       E R R A T A   S H E E T
2   PAGE  LINE      CHANGE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 169

1   STATE OF MICHIGAN )
2                     )
    COUNTY OF OAKLAND )
3
4           I, MARY OPPENHEIM, a Notary Public within and
5   for the County of Oakland, State of Michigan, do hereby
6   certify that the witness whose attached deposition was taken
7   before me in the above-entitled matter was by me duly sworn
8   at the aforementioned time and place; that the testimony
9   given by said witness was stenographically recorded in the
10  presence of said witness and afterwards transcribed upon a
11  computer under my personal supervision, and that the said
12  deposition is a full, true, and correct transcript of the
13  testimony given by the witness.
14          I further certify that I am not connected by
15  blood or marriage with any of the parties or their attorneys
16  and that I am not an employee of either of them, nor
17  financially interested in the action.
18
19
20
21  _____
    Mary Oppenheim, CSR 5186
    Notary Public, Oakland County, Michigan
22  Acting in the County of Wayne
    My Commission expires: October 23, 2017
23
24
25

43  (Pages 166 to 169)